# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 1, 2008 Session

## PENNY FOREMAN v. AUTOMATIC SYSTEMS, INC. ET AL.

**Appeal by Permission from the Special Workers' Compensation Appeals Panel**
**Rutherford County Chancery Court**
**No. 04385   Robert Corlew, Chancellor**

---

**No. M2007-00325-SC-WCM-WC - Filed December 31, 2008**

---

In this appeal, we determine the extent of Employee's disability as a result of her June 24, 2004, work-related back injury. Prior to this work-related injury, Employee had been treated intermittently for back problems since 1995. The trial court determined that the June 24 injury caused only a temporary aggravation of Employee's pre-existing condition and that this aggravation had resolved itself by September 7, 2004. On appeal, the Special Workers' Compensation Appeals Panel agreed that Employee sustained only a temporary aggravation of her pre-existing condition. However, a majority of the Appeals Panel determined that Employee's temporary aggravation had not reached maximum recovery until November 2, 2005, and thus, Employer should be responsible for Employee's disability benefits and medical expenses until that time. Upon review of the record, we hold that the record does not preponderate against the trial court's findings. Accordingly, we reverse the Appeals Panel and reinstate the trial court's judgment.

**Tenn. Code Ann. § 50-6-225(e) (2008) Appeal as of Right; Judgment of the Panel Reversed;**
**Judgment of the Chancery Court Reinstated**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., GARY R. WADE, J., and E. RILEY ANDERSON and ADOLPHO A. BIRCH, JR., SP. JJ., joined.

Richard C. Mangelsdorf, Jr., Nashville, Tennessee, for the appellants, Automatic Systems, Inc. and Liberty Mutual Insurance Company.

Stephen K. Heard and Adam O. Knight, Nashville, Tennessee, for the appellee, Penny Foreman.

Phillip P. Welty and Mary Taylor Gallagher, Nashville, Tennessee, for the intervenor/appellee CIGNA HealthCare.

## OPINION

## Factual & Procedural History

Penny Foreman ("Employee"), forty-seven years old at the time of trial, has a high school diploma, two years of college education, and technical training in computer-assisted drafting. Her work history includes employment as a waitress, shipping clerk, and ironworker. In 1989, she enrolled in an ironworker's apprenticeship through the Ironworkers Union. Since her completion of the apprenticeship in 1992, Employee, except in times of layoff, has been a full-time ironworker.

As an ironworker, Employee assisted in the construction and "fabrication of steel members." As Employee explained, "[w]e assemble machinery, we set machinery-just about anything having to do with heavy industrial commercial construction with regards to structural steel, mechanical and machinery applications." Employee testified that her average work week is 60 to 65 hours per week. Employee's husband, also an ironworker, testified that "[ironwork is] very dangerous work, very strenuous work. You have to be in tiptop shape to do it. It involves a lot of climbing, carrying heavy objects, [and] wearing a structural tool belt which weighs 50 plus pounds."

In January 1995, while employed by Du Pont at its New Johnsonville plant, Employee was involved in a rear-end automobile collision. This injury was not work-related. Following the accident, Employee went to the Goodlark Regional Medical Center Emergency Room in Dickson, Tennessee, with complaints of back pain. Employee was treated by Dr. Jan Gorzny. According to Dr. Gorzny's office notes,[1] Employee's "chief complaint" was "deep burning, pain upper back, left shoulder, neck, [and] H.A."[2] After performing a physical examination of Employee, Dr. Gorzny ordered x-rays of Employee's left hip, left shoulder, lumbar spine, cervical spine, and pelvis. Dr. Gorzny's diagnosis was multiple contusions and muscle strain. Dr. Gorzny prescribed medication and ordered Employee to "rest, ice, heat – per instructions." Employee's husband testified that Employee missed approximately one month of work following this car wreck due to back pain.

On March 8, 2001, Employee again visited Dr. Gorzny with complaints of "discomfort in her low back over the left side in the paraspinal muscle with referral of pain down the left leg to the little toe," which had persisted for approximately two weeks. Dr. Gorzny's notes do not reflect that Employee related that her work caused this pain. Dr. Gorzny diagnosed Employee as having sciatic nerve inflammation or irritation. He recommended "injecting the trigger point with Depo-Medrol and Xylocaine." Dr. Gorzny also ordered x-rays of Employee's spine and left hip.

---

[1]Dr. Gorzny did not testify at trial. Therefore, all information pertaining to Dr. Gorzny's treatment of Employee are gleaned from his office notes, which are contained in the record.

[2]It is unclear from the record what "H.A." stands for.

X-rays, taken on March 12, 2001, revealed grade I spondylolisthesis[3] of L5, specifically "[t]here is anterior displacement of L5 relative to S1, and pars interarticularis defects[4] are noted bilaterally at L5." Employee returned to Dr. Gorzny's office on March 16. After reviewing the x-rays, he noted that "[Employee's] symptoms are related to the spondylolisthesis. She has a very deep slip angle along the sacrum." Given this diagnosis, Dr. Gorzny recommended "management with conservative modalities, including obtaining [a] back brace, refer[ral] to physical therapy and Vioxx 25 mg. daily." Employee testified at trial that she was unaware that Dr. Gorzny diagnosed her in 2001 as having spondylolisthesis. As she explained, "he has a very thick accent, and to be quite frank with you, I couldn't understand pretty much ninety to a hundred percent of anything he was telling me, and that's why I called my insurance company and asked them if I could get another doctor."

On March 28, 2001, Employee visited Dr. Daniel Burrus, an orthopedic surgeon whose primary practice is treating spine-related problems. On the medical intake form, Employee noted pain in her lower back, left hip, and right leg. In Dr. Burrus' office notes, however, he wrote that Employee presented with complaints of back and left leg pain radiating "down her left lower extremity." Employee explained that her pain began four to six weeks earlier without specific injury and that the pain had progressively worsened since that time. After conducting a physical examination, Dr. Burrus noted that Employee had "moderately diminished range of motion" in her back; "[t]here is pain with extension." Dr. Burrus' impression was that Employee's pain was caused by "symptomatic spondylolisthesis." Dr. Burrus recommended "an MRI to fully evaluate this." He also noted, "We will probably try a course of physical therapy versus epidural steroids before considering the potential for surgical intervention." Dr. Burrus recommended that Employee return in three weeks.

An MRI, taken on March 30, 2001, revealed grade I spondylolisthesis of L5 on S1 secondary to "bilateral chronic appearing spondylolysis." After reviewing the MRI report, Dr. Burrus recommended conservative management with a Medrol Dosepak and physical therapy.

On June 20, 2001, Employee returned to Dr. Burrus' office for a follow-up appointment. At this time, Employee reported improvement and related that physical therapy had significantly reduced her symptoms, noting that she had only occasional pain.

On July 17, 2002, Employee was involved in another non-job-related rear-end automobile collision. Following the collision, Employee went to the Clarksville Emergency Room for x-rays. She missed two days of work.

---

[3]According to Dr. Daniel Burrus, spondylolisthesis refers to the fact that the vertebra, in this case L5, has slipped forward in relationship to S1, which is the sacrum. Spondylolisthesis is graded in four categories: I, II, III, IV. Grade I is the lowest grade. Therefore, in Employee's case, there is slippage of zero to twenty-five percent between L5 and S1.

[4]According to Dr. Burrus, pars defects are either a congenital or acquired condition where the posterior elements of L5 are not attached to the anterior or front portion of the vertebrae.

On July 31, 2002, Employee returned to Dr. Burrus' office with complaints of back and lower left extremity pain. On Dr. Burrus' medical intake form from that visit appeared a picture of the human body with the instruction, "On the picture below, please mark 'xxxx' over the areas where you have pain." Employee placed "xxxx" on the lower back, lower spine, upper left leg, left pelvis, and upper right leg areas of the image. After a physical examination and review of x-rays, Dr. Burrus determined that her pain was an aggravation of her spondylolisthesis, and he recommended continuation of her exercise program.

On June 10, 2003, Employee returned to see Dr. Burrus with complaints of increased pain in her back, similar to what she had previously experienced, and pain and burning in her coccygeal area. Dr. Burrus opined that this pain was caused by a local irritation of her coccyx.

In March 2004, Employee began working for Automatic Systems, Inc. ("Employer") at the Nissan Plant in Smyrna, Tennessee. On May 7, 2004, Employee again returned to Dr. Burrus with complaints of back pain similar to what she had experienced previously. Employee related to Dr. Burrus that she had managed her pain predominantly with herbal supplements, but at times, the pain was "much more problematic." Given her pain, Employee questioned "whether a pain management type environment would be appropriate." Dr. Burrus opined in his office notes, "She (Employee) notes most of the time she doesn't have to take anything for her symptoms but occasionally she has significant aggravation." Dr. Burrus noted that Employee's back range of motion was mildly diminished and that she was "tender in the lower lumbar region in the area of her spondylolisthesis." Dr. Burrus ordered x-rays, which revealed no significant progression of her spondylolisthesis.

Based on his physical examination and the x-ray findings, Dr. Burrus provided Employee with pain medication "for when the symptoms were very severe" and discussed the option of surgical intervention. During his deposition, Dr. Burrus explained that he suggested possible surgical intervention at that time because, "for a spondylolisthesis, a fusion type[5] of operation is generally the recommended treatment." Dr. Burrus explained that he considers two criteria before recommending surgical intervention: first, "[whether] the patient had a neurologic deficit or a progressive neurologic deficit"; and second, "whether the pain that they are experiencing . . . is interfering with their lifestyle enough that they would want to consider doing something from a surgical standpoint." Dr. Burrus testified that Employee was not interested in pursuing surgical intervention at that time.

On June 24, 2004, while working for Employer, Employee was moving 100-pound pallets with a co-worker when she felt a sharp pain in her lower back, which radiated into her lower left extremity. She was taken by ambulance to a nearby emergency room, where she was treated and released with instructions to follow up with Dr. Burrus. Because Employer did not dispute that Employee had "a definite specific workplace injury" on June 24, Employee's workers' compensation

---

[5]Dr. Burrus testified that the surgery discussed was a fusion of the L5 and S1 vertebrae.

-4-

claim was initially accepted by Liberty Mutual[6] Insurance Company, Employer's workers' compensation insurance carrier, and as such, Employee received temporary disability and medical benefits.

Employee saw Dr. Burrus again on July 2, 2004. During this visit, Employee was again asked to "mark 'xxxx' over the areas [of the image] where you have pain" on the medical intake form. Similar to her July 2002 intake form, Employee placed "xxxx" on the lower back, lower spine, left upper leg, and right upper leg of the image. Employee also indicated that she had pain extending down into her left lower leg and foot, similar to her complaint during her March 28, 2001 appointment with Dr. Burrus. In neither image did Employee note right lower leg or foot pain. After a physical exam, Dr. Burrus noted that "[h]er back range of motion [i]s mildly diminished. Her reflexes and motor strength [a]re normal. Her hip and abdominal exam [a]re unremarkable . . . she [i]s neurologically intact, so there ha[s] been no change." Dr. Burrus ordered new x-rays, which revealed no "interval change in her spondylolisthesis." Based on these findings, Dr. Burrus prescribed medication and recommended physical therapy. Dr. Burrus opined in his office notes, "I feel [her increased pain] is an aggravation of her previous known spondylolisthesis."

At a follow-up visit on July 16, 2004, Employee expressed dissatisfaction with physical therapy, stating it was not decreasing her pain. Dr. Burrus recommended epidural steroid injections. Employee decided to discuss her treatment options with her husband before making a decision.

On August 11, Employee returned to Dr. Burrus' office complaining of significant continued pain in the back and lower extremities. Because of transportation issues, she had not proceeded with the epidural injections. Additionally, Dr. Burrus and Employee again discussed the possibility of surgical intervention if the injections did not alleviate Employee's pain.

On August 23, Employee received an epidural steroid injection from Dr. Robert Clendenin. On September 7, 2004, Employee visited Dr. Burrus for the last time. Employee complained that the injections had provided very little, if any, pain relief. Dr. Burrus again explained the treatment options of continued conservative treatment versus surgical intervention. Following this discussion, Employee indicated that she was ready "to undergo operative intervention." Additionally, during this visit, Dr. Burrus noted that Employee's diagnosis of grade I spondylolisthesis with bilateral pars defects was the same diagnosis he supplied in March 2001 and that her neurologic condition had not changed.[7]

During his deposition, Dr. Burrus testified that a repeat MRI scan, done after the work injury, revealed no significant change to Employee's condition. Based on the MRI and x-rays, Dr. Burrus stated that Employee "had been symptomatic with [her spondylolisthesis] off and on for several

_____

[6]For ease of reference in this opinion, the term "Employer" will be used to refer to either or both Liberty Mutual and Automatic Systems, Inc.

[7]Based on this assessment, Liberty Mutual determined that the recommended surgery was not related to her work injury and denied payment.

years" and that her symptoms after the work injury were "similar to what she had experienced over the years" except her pain was worse. Specifically, Dr. Burrus opined that the work injury caused "a temporary exacerbation of her symptoms." Dr. Burrus based this determination on the fact that Employee's previous exacerbations of pain "settled down" over time and that this exacerbation of pain resembled Employee's previous symptoms. He stated that her spondylolisthesis grade I and bilateral pars defects were not something that happened as a result of her June 2004 injury. Dr. Burrus also stated that any surgery Employee might have had after the work injury was not related to her work injury. Moreover, in response to several different questions, Dr. Burrus stated that he could not find a causal connection between Employee's permanent condition and her June 2004 work incident. Additionally, although Dr. Burrus agreed in response to a question that it was a "possibility" that there was an anatomical change in Employee's back after the work injury, Dr. Burrus stated that he "didn't appreciate that there had been any progression of the spondylolisthesis on either her [x-rays] or on her MRI." Finally, when asked whether Employee had radicular-type pain after the work injury, Dr. Burrus responded that Employee complained of radicular pain both before and after the work injury, but he found "no objective evidence of radiculopathy" to support Employee's subjective complaints.

Employee testified that Dr. Burrus cleared her to return to limited duty work after the September 7, 2004 visit. However, as Employee explained, there is no such thing as limited duty ironwork.[8] Employer paid Employee temporary total disability benefits through December 2004. As of the date of trial, Employee had not returned to work. At trial, Employee testified that since her work injury she has been unable to do many of the things that she enjoyed prior to the work injury, including hiking, gardening, camping, boating, and other physical activities.

On September 24, 2004, Employee filed a workers' compensation claim, alleging a compensable work-related injury on June 24, 2004. She averred that she was totally disabled due to the injury. In an answer filed on November 15, Employer denied that Employee's injury was compensable, alleging instead that Employee's pre-existing spondylolisthesis was responsible for any permanent disability or treatment incurred. Subsequently, in December 2004, Liberty Mutual denied Employee any further medical or disability benefits and a Notice of Denial of the workers' compensation claim was filed with the Department of Labor.[9] On December 17, 2004, the trial court denied Employee's motion to compel medical treatment and temporary total disability benefits, stating:

> The Court is of the opinion that [Employee] has failed to establish facts or medical opinions sufficient to justify a pre-trial order directing [Employer and Liberty Mutual] to pay for the surgical procedure which has been recommended by Dr. Burrus. The Court is further of the opinion that [Employee] has failed to establish

---

[8]If Dr. Burrus returned Employee to work with restrictions, a notation of those restrictions does not appear in the record.

[9]From the date of injury until December 2004, Employee received temporary total disability benefits at a rate of $618 per week.

-6-

her entitlement to additional temporary total disability benefits at this time.

On February 3, 2005,[10] nearly five months after her last visit with Dr. Burrus, Employee visited another orthopaedic surgeon, Dr. Juan Stacy Dinkins. Employee was referred to Dr. Dinkins through her insurance provider. She complained of continuing pain from her June 2004 work injury. After taking a medical history and performing a physical examination, Dr. Dinkins noted that Employee had grade I spondylolisthesis, pars articularis defects at L5-S1, degenerative disc disease, sciatica, radiculitis, and low back pain. Dr. Dinkins ordered a CT, MRI, and an EMG of her lumbar spine and prescribed a back brace. The tests confirmed Dr. Dinkins' diagnosis of grade I spondylolisthesis and right S1 radiculopathy. Although Employee had noted upper right leg radicular-type pain on Dr. Burrus' medical intake form, this was the first objective finding in Employee's medical records of radiculopathy, or radicular pain down her right leg. Dr. Dinkins suggested additional conservative measures or the possibility of a surgical fusion. During this visit, Employee did not inform Dr. Dinkins of her 1995 car wreck and subsequent back injury, her 2002 car wreck and subsequent back pain, or her June 2003 and May 2004 appointments with Dr. Burrus.

Employee returned to Dr. Dinkins on March 8, 2005, advising that there was no significant improvement in her condition. Dr. Dinkins again suggested surgical intervention. Employee consulted Dr. Dinkins again on July 15, 2005, displaying some "myelopathic[11] symptoms" of numbness and tingling. At this time, Employee found the pain to be unbearable and requested surgical intervention. Employee returned on August 8, and Dr. Dinkins repeated some x-ray imaging studies. They discussed the risks of any possible surgery.

On August 12, 2005, Dr. Dinkins performed a "lumbar decompression bilaterally at L5-S1." During the operation, a bony element of Employee's spine was inadvertently broken, which required additional bone grafting. Also, a tear occurred in the sac surrounding the spinal nerves, which necessitated additional repair. The combined procedures took seven hours. The costs of this surgery were reimbursed by Employee's healthcare insurance provider.

During her first post-surgical visit on August 24, 2005, Employee related that "she [wa]s feeling much improved," with most of her pain relating to the incision site caused by the bone grafting. She also had some left foot numbness which was improving. Post-operation, Dr. Dinkins diagnosed Employee as having "spondylolisthesis grade 1 of L5 on S1, spondylosis without myelopathic symptoms."

On September 30, 2005, in response to a written inquiry from Employee's counsel, Dr. Dinkins replied that he was "unable to determine" if the work injury had aggravated Employee's pre-existing spondyolisthesis or if the incident had caused an anatomical change in that condition. On

---

[10]If Employee sought any medical treatment for her spondylolisthesis between September 2004 and February 2005, those medical records are not contained in the record on appeal.

[11]"Myelopathic" is defined as functional disturbances and/or pathological changes in the spinal cord. Dorland's Illustrated Medical Dictionary 1088 (27th ed. 1988).

November 2, 2005, Dr. Dinkins completed a C-32–Standard Form Medical Report for Industrial Injuries–for the Department of Labor. In the form, he noted that Employee had been temporarily totally disabled from the time of surgery until November 2, 2005, and that she had reached maximum medical improvement as of November 2. Dr. Dinkins assigned a permanent impairment rating of 26% to the body as a whole.[12] In the form, Dr. Dinkins also responded "unknown" to the question: "Considering the nature of [Employee's] occupation and medical history along with diagnosis and treatment, does this injury more probably than not arise out of the [Employee's] employment?"

Dr. Dinkins continued to see Employee until May 25, 2006. Following surgery, Employee continued to improve. She retained some symptoms, which were primarily related to physical activity. By May, Employee was almost pain-free and symptom-free. During this visit, Dr. Dinkins assigned permanent restrictions of "no heavy lifting, no sudden twisting motions, and no prolonged sitting and standing."

In his August 29, 2006 deposition, Dr. Dinkins indicated that because he had not treated Employee before the June 2004 incident, he could not make a causation determination. Specifically, Employee's counsel posed this question:

> Q.    All right. Within - in your opinion, which we've already agreed you will give your opinion within a reasonable degree of medical certainty unless you indicate otherwise, would the lifting incident of June 24, 2004, as described and true . . . would that have anatomically changed her condition such as to increase her pain?

Dr. Dinkins responded:

> A:    Based on my medical certainty, I would not - I cannot say it would have changed her condition because I think she has a spondylolisthesis, sir. . . . and could it have made it worsen? I have to say yes, it could have made it worsen. . . . and so I can't - I don't know if it changed her condition because I had not seen her before.

Employee's counsel also posed this question: "Would you agree or do you have a medical opinion that the lifting incident caused something mechanically to happen in her back such as to cause pain?" Dr. Dinkins responded, "[With the facts] you described, yes, sir."

On cross examination, however, Employer's counsel informed Dr. Dinkins of events in Employee's medical history that were not related to him during his treatment of Employee. Specifically, Dr. Dinkins testified that Employee never mentioned her 1995 and 2002 automobile accidents. She also did not advise him about her prior consultation with and treatment by Dr.

---

[12]This is the same impairment rating Dr. Dinkins assigned on July 22, 2005, approximately two weeks before Employee's surgical intervention.

Burrus.  After Dr. Dinkins was provided a full medical history, Dr. Dinkins stated that he was unable to determine whether the lifting incident of June 24, 2004, resulted in an anatomical change with regard to Employee's spondyolisthesis at the L5-S1 level.

Dr. David Gaw performed two independent medical examinations ("IME") at the request of Employee's counsel.  The first examination took place in November 2004 before the August 2005 fusion surgery; the second occurred on August 1, 2006.  In his first deposition in January 2005, Dr. Gaw opined that the spondylolisthesis was not caused by the June 2004 work injury.  However, he testified that the incident had "advanced [or] accelerated the pre-existing spondylolisthesis, which has resulted in the lumbar radiculopathy which was not previously present."  Dr. Gaw based his opinion, at that time, upon the history given to him by Employee, medical records supplied by counsel, and his examination of Employee.

On cross examination, Dr. Gaw acknowledged that the medical history supplied to him by Employee was incomplete.  Specifically, Employee told him that she had injured her back in 2001 and had been diagnosed with spondylolisthesis at that time, that she had completely gotten over that injury, and was asymptomatic prior to her work injury.  Dr. Gaw agreed that Employee did not advise him that she had sustained a back injury in 1995 as a result of an automobile accident; that she had sustained another injury to her back in 2002, also from an automobile accident; or that she had consulted Dr. Burrus in June 2003 and May 2004 and had discussed pain management and surgery with him during the latter visit.  Although Dr. Gaw was not provided Dr. Gorzny's office notes, he was provided with all of Dr. Burrus' records. Dr. Gaw agreed that Dr. Burrus' records showed Employee had complained of  radiculopathy-type pain prior to the work injury; however, he stated that the radiculopathy was "not persistent."  Moreover, Dr. Gaw stated that pain is the primary problem associated with spondylolisthesis and that Employee had suffered an exacerbation of her pain level with respect to the pre-existing spondylolisthesis.  On redirect, Dr. Gaw did opine, however, that he also believed there were actual anatomical changes associated with the June 2004 incident.

Dr. Gaw performed a second IME on August 1, 2006, about one year after surgery.  At that time, Employee reported that her pain was better, though it persisted during daily living activities. She also continued to have some numbness of the right foot.  She also had dysesthesia[13] of the left anterior lateral thigh.  Based on the fusion surgery and his diagnosis of radiculopathy, Dr. Gaw assigned a permanent impairment of 26.5% or 27% to the body as a whole.[14]

---

[13]"Dysesthesia" is defined as "an unpleasant abnormal sensation produced by normal stimuli." Dorland's Illustrated Medical Dictionary 517 (27th ed. 1988).

[14]This rating is the standard impairment rating for any employee who has "significant signs of radiculopathy, . . . sensory loss, loss of relevant reflex(es), loss of muscle strength," and who has attempted either a successful or unsuccessful surgical fusion.  American Medical Association Guides to the Evaluation of Permanent Impairment 384 (Linda Cocchiarella & Gunnar B.J. Andersson eds., 5th ed. 2000).

At the time of his second deposition in October 2006, Dr. Gaw was aware of Employee's full medical history. He testified that the increase in pain Employee experienced after the work injury demonstrated that "there had to be an anatomic change, be it microscopic, chemical, hormonal, or whatever." Dr. Gaw agreed, however, that Employee's spondylolisthesis remained at grade I after the work injury. He concluded that Employee was totally disabled from the date of her June 2004 work injury until November 2, 2005, the date Dr. Dinkins determined that Employee reached maximum medical improvement. Dr. Gaw assigned permanent lifting restrictions of thirty to forty pounds and avoidance of repetitive twisting or bending.

Prior to trial, CIGNA HealthCare ("Intervenor"), Employee's healthcare insurance provider, filed a motion to intervene. In the motion, Intervenor requested reimbursement of $58,109.68 for medical expenses resulting from the work injury if the court deemed that this incident was compensable under the workers' compensation statutes. The trial court granted the motion.

The trial in this matter was held on January 9, 2007. Plaintiff testified about her condition. Michelle McBroom Weiss, a vocational evaluator, testified that Employee retained a vocational disability of 62% based upon restrictions suggested by Dr. Gaw and an 87% to 100% disability based on restrictions imposed by Dr. Dinkins. All medical testimony was presented by deposition and medical records.

After reviewing the medical depositions and listening to testimony in open court, the trial court found that "Employee sustained an injury on June 24, 2004, but the evidence preponderates against a finding of the existence of a change in the Employee's anatomical condition as a result of this injury." Additionally, the court stated, "[w]e find that [Employee] sustained a temporary injury and that the treatment provided by Dr. Burrus adequately addressed that temporary problem. We recognize that Dr. Dinkins' treatment was appropriate, but we cannot find the causal connection between that treatment and the injury of June 24, 2004." The trial court also found that Employee's temporary aggravation had resolved itself as of September 7, 2004. Accordingly, the trial court denied Employee's claim for permanent partial disability benefits and dismissed her claim.[15] As a result, the trial court also dismissed Intervenor's claim. The trial court granted Employer's motion for discretionary costs.

Employee sought appellate review. The Special Workers' Compensation Appeals Panel ("Appeals Panel") held that the evidence did not preponderate "against the conclusion reached by the trial court that [Employee] sustained only a temporary aggravation of a pre-existing condition." Contrary to the trial court, however, a majority of the Appeals Panel[16] determined that Employee did not reach maximum medical improvement until November 2, 2005, after her surgery. Moreover, the majority of the Appeals Panel concluded that Liberty Mutual, Employer's workers' compensation

_____

[15]As it was obligated to do, the trial court made an alternative finding that, if Employee's injury was found to be causally connected to her work injury, she had sustained a 60% vocational disability. See, e.g., Cunningham v. Shelton Sec. Serv., Inc., 46 S.W.3d 131, 137-38 (Tenn. 2001).

[16]Justice Koch dissented in part.

-10-

insurance provider, was liable for "all of [Employee's] medical expenses whether paid by her or [Intervenor]." Accordingly, the Appeals Panel remanded the case to the trial court for calculation and award of temporary total disability benefits from the date of last payment in 2004 until November 2, 2005, and for a calculation of medical expenses to be reimbursed by Liberty Mutual to Employee and Intervenor. Both Employee and Employer sought this Court's review.

**Standard of Review**

The standard of review of issues of fact is "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the findings, unless the preponderance of evidence is otherwise." Tenn. Code Ann. § 50-6-225(e)(2) (2008). When credibility and weight to be given testimony are involved, considerable deference is given to the trial court when the trial judge has had the opportunity to observe the witness' demeanor and hear in-court testimony. Whirlpool Corp. v. Nakhoneinh, 69 S.W.3d 164, 167 (Tenn. 2002). When the issues involve expert medical testimony that is contained in the record by deposition, determination of the weight and credibility of the evidence necessarily must be drawn from the contents of the depositions, and the reviewing court may draw its own conclusions with regard to those issues. Orrick v. Bestway Trucking, Inc., 184 S.W.3d 211, 216 (Tenn. 2006). A trial court's conclusions of law are reviewed de novo upon the record with no presumption of correctness. Perrin v. Gaylord Entm't Co., 120 S.W.3d 823, 826 (Tenn. 2003); Ganzevoort v. Russell, 949 S.W.2d 293, 296 (Tenn. 1997).

**Analysis**

As noted by this Court in Trosper v. Armstrong Wood Products, No. E2007-00816-SC-WCM-WC, slip op. at 5 (Tenn. Dec. 30, 2008), an employee seeking workers' compensation benefits must prove that the injury, which causes either disablement or death, both arose out of and occurred in the course of employment. See Tenn. Code Ann. § 50-6-102(12) (2008). In Tennessee, as in most other jurisdictions, these two statutory requirements are not synonymous. Glisson v. Mohon Int'l, Inc./Campbell Ray, 185 S.W.3d 348, 353 (Tenn. 2006). An injury occurs in the course of employment if it takes place while the employee is performing a duty he or she is employed to perform. Fink v. Caudle, 856 S.W.2d 952, 958 (Tenn. 1993). Thus, the "course of employment" requirement focuses on the time, place, and circumstances of the injury. Wilhelm v. Krogers, 235 S.W.3d 122, 127 (Tenn. 2007).

In contrast, the "arising out of employment" requirement refers to causation. Reeser v. Yellow Freight Sys., Inc., 938 S.W.2d 690, 692 (Tenn. 1997). An injury arises out of employment when there is a causal connection between the conditions under which the work is required to be performed and the resulting injury. Fritts v. Safety Nat'l Cas. Corp., 163 S.W.3d 673, 678 (Tenn. 2005). The injury must result from a danger or hazard peculiar to the work or be caused by a risk inherent in the nature of the work. Thornton v. RCA Serv. Co., 188 Tenn. 644, 647, 221 S.W.2d 954, 955 (1949). Accordingly, "'an injury purely coincidental, or contemporaneous, or collateral, with the employment, . . . will not cause the injury . . . to be considered as arising out of the employment.'" Jackson v. Clark & Fay, Inc., 197 Tenn. 135, 137, 270 S.W.2d 389, 390 (1954)

(quoting Scott v. Shinn, 171 Tenn. 478, 482-83, 105 S.W.2d 103, 105 (1937) (first alteration in original)).

Employee has the burden of proving every element of her case by a preponderance of the evidence. Elmore v. Travelers Ins. Co., 824 S.W.2d 541, 543 (Tenn. 1992). With regard to the element of causation, a plaintiff carries her burden when the proof demonstrates that the "injury has a rational, causal connection to the work." Braden v. Sears, Roebuck & Co., 833 S.W.2d 496, 498 (Tenn. 1992). "Although absolute certainty is not required for proof of causation, medical proof that the injury was caused in the course of the employee's work must not be speculative or so uncertain regarding the cause of the injury that attributing it to the [employee's] employment would be an arbitrary determination or a mere possibility." Tindall v. Waring Park Ass'n, 725 S.W.2d 935, 937 (Tenn. 1987) (citations omitted). "If, upon undisputed proof, it is conjectural whether disability resulted from a cause operating within [the employee's] employment, or a cause operating without [her] employment, there can be no award." Tibbals Flooring Co. v. Stanfill, 219 Tenn. 498, 508, 410 S.W.2d 892, 897 (1967).

If an employee carries her burden of proving that she suffered "an injury by accident arising out of and in the course of employment that causes either disablement or death," the employee is awarded disability benefits based on the extent of her disability. Tenn. Code Ann. § 50-6-102(12), -207 (2008). Compensable disabilities are divided into four separate classifications: (1) temporary total disability, (2) temporary partial disability, (3) permanent partial disability, and (4) permanent total disability. Id. § 50-6-207. An employee is considered temporarily totally disabled while, as a result of a work injury, he cannot work and "during which he is recuperating as far as the nature of his injury permits." Gluck Bros. v. Coffey, 222 Tenn. 6, 13, 431 S.W.2d 756, 759 (1968). Eligibility for temporary total disability benefits terminates when the employee reaches maximum recovery or returns to work. Roberson v. Loretto Casket Co., 722 S.W.2d 380, 383 (Tenn. 1986). If, after obtaining maximum recovery, the employee is found to have a permanent disability, the employee is entitled to benefits based on a percentage of disability. Corcoran v. Foster Auto GMC, Inc., 746 S.W.2d 452, 459 (Tenn. 1988); see Tenn. Code Ann. § 50-6-241, -242. Generally, expert medical evidence is required to establish permanency. Corcoran, 746 S.W.2d at 457. If the expert and lay testimony do not demonstrate that the employee suffered a permanent disability as a result of the work injury, however, then the employee is not entitled to permanent disability benefits.

*A. Spondylolisthesis & Permanent Disability*

Spondylolisthesis is the "forward displacement of one vertebra over another, usually the fifth lumbar [L5] over the body of the sacrum [S1], usually due to a developmental defect in the pars interarticularis." Dorland's Illustrated Medical Dictionary 1779 (31st ed. 2007). Spondylolisthesis "is usually either congenital or degenerative." Anderson v. Alcoa Fukikara, Ltd., No. 01S01-9802-CH-00019, 1999 WL 32977, at *1 (Tenn. Workers' Comp. Panel Jan. 26, 1999); see Wilson v. Worthco, Inc., No. 02S01-9712-CH-00113, 1998 WL 729695, at *2 (Tenn. Workers' Comp. Panel Oct. 21, 1998). Although it is unclear from the record whether Employee's spondylolisthesis is congenital or degenerative, it is clear from the record that following the 1995 automobile accident

-12-

Employee's spondylolisthesis became symptomatic. And, as her medical records indicate, her spondylolisthesis continued to degenerate from 1995 up until and after the June 2004 work injury.

Both parties agree that Employee was diagnosed with grade I spondylolisthesis at L5-S1 long prior to her work injury and that the symptoms grew progressively worse. The parties also agree that in 2004 Employee suffered a work-related injury that aggravated the spondylolisthesis, and from this work injury, Employee was entitled to temporary total disability benefits. Ultimately, Employee had surgery to improve her situation. At the time of, and after her surgery, Employee still had grade I spondylolisthesis. The only question in dispute, therefore, is whether the work injury in some way advanced the severity of the pre-existing condition or caused a new, distinct permanent disability as a result of the pre-existing condition, such that Employee is entitled to permanent partial or permanent total disability benefits, or whether the work injury only temporarily aggravated Employee's pre-existing condition such that Employee was only entitled to temporary total disability benefits. See Trosper, No. E2007-00816-SC-WCM-WC, slip op. at 8 (Tenn. Dec. 30, 2008); Smith v. Smith's Transfer Corp., 735 S.W.2d 221, 225-26 (Tenn. 1987).

This Court has made clear that an aggravation of a pre-existing condition that results only in increased pain, without an actual advancement in the severity of the condition, is not a compensable injury. See, e.g., Trosper, No. E2007-00816-SC-WCM-WC, slip op. at 8 (Tenn. Dec. 30, 2008); Cunningham v. Goodyear Tire & Rubber Co., 811 S.W.2d 888, 891 (Tenn. 1991); Smith's Transfer, 735 S.W.2d at 225-26. Although this principle has not always been consistently applied, this Court recently reconfirmed in Trosper[17] that pain, by itself, is not sufficient to support an award of benefits. E2007-00816-SC-WCM-WC, slip op. at 8 (Tenn. Dec. 30, 2008). The Trosper Court also clarified that, "if the work injury advances the severity of the pre-existing condition, or if, as a result of the pre-existing condition, the employee suffers a new, distinct injury other than increased pain, then the work injury is compensable." Id. The same result is reached when there is only increased pain but no anatomical change. Barnett v. Milan Seating Sys., 215 S.W.3d 828, 835 (Tenn. 2007). Thus, we analyze this case consistently with the principles set forth in Trosper. Of course, each case turns on its own facts and medical opinions.

The record in this case reflects that Employee had an extensive history of back problems prior to her work injury. In 2001, both Drs. Gorzny and Burrus, who treated Employee, diagnosed her as having grade I spondylolisthesis at L5-S1. The condition, including some radiculopathy symptoms, was intermittently symptomatic, requiring medical care on several occasions before June 2004. Cf. Sweat v. Superior Indus., 966 S.W.2d 31, 32-34 (Tenn. 1998) (in finding that employee's psoriatic arthritis was a compensable work injury, the Panel emphasized that, in addition to a physician's testimony that employee's work activities "resulted in actual progression of his underlying" condition, the employee "was asymptomatic prior to working for [the employer]"). While Employee initially improved after undergoing physical therapy, over time all conservative nonsurgical treatments were unsuccessful. In fact, Employee consulted Dr. Burrus concerning back pain approximately seven weeks before the work injury, and they discussed surgery as a treatment option

---

[17]Trosper also deals with a degenerative condition, arthritis.

at that time.

Dr. Burrus, the only doctor to treat and examine Employee both before and after the work injury, opined that a repeat MRI scan done after the work injury revealed no "significant change" to Employee's pre-work injury spondylolisthesis diagnosis. When questioned about his use of the word "significant," Dr. Burrus stated that, although he agreed it was "possible" that the work injury caused an anatomical change in Employee's back, he "didn't appreciate that there had been any progression of the spondylolisthesis on either her [x-rays] or on her MRI." Based on these objective studies, Dr. Burrus concluded that the work injury did not cause an anatomical change, or stated differently, the work injury did not advance the severity of her spondylolisthesis. As Dr. Burrus explained, the pain after the work injury "was similar to what she had experienced over the years." Specifically, Dr. Burrus explained that he believed the work injury caused "a temporary exacerbation of her symptoms," which ultimately resolved themselves to their pre-injury status. When asked whether Employee's complaints of radicular-type pain were an indication of an anatomical change, or other advancement in the severity of her condition, Dr. Burrus explained that although Employee complained of such pain, a subjective finding, he found "no objective evidence of radiculopathy." Additionally, Dr. Burrus opined unequivocally that the need for surgery was evident before, and thus not related to, the work injury. Based on this determination, Dr. Burrus did not assign a permanent impairment rating related to the work incident.

Dr. Dinkins, who first saw and treated Employee more than seven months after her work injury, also could not state that Employee's work injury caused an anatomical change or otherwise advanced the severity of her spondylolisthesis. Subsequent to Employee's August 2005 surgery, Dr. Dinkins wrote that he was "unable to determine" whether Employee's injury had temporarily aggravated Employee's pre-existing spondylolisthesis or if the incident had caused a permanent worsening of that condition. While he did testify that "she could have had an exacerbation of her symptoms that could put her over the mark to cause her to seek surgical intervention," we are not persuaded that this testimony demonstrates, even by a preponderance of the evidence, that Employee's work injury caused an anatomical change or otherwise permanently advanced the severity of Employee's spondylolisthesis.

Dr. Gaw, who did not treat Employee, but performed two independent medical evaluations, opined that the increased pain after June 2004 must have been the result of an anatomical change. However, he was not able to describe what that change was and was unable to provide any objective tests to support that finding.

Given this testimony, we accredit, as did the trial court, the testimony of Dr. Burrus, the treating physician, over that of Drs. Dinkins and Gaw. Dr. Burrus had the benefit of observing Employee over a period of years. He saw Employee both before and immediately following the work injury, was aware of her complete medical history, and based his opinion upon his personal knowledge of her condition. Dr. Dinkins' testimony was of limited usefulness because he was "unable to determine" whether the work injury permanently advanced the severity of her condition. And, Dr. Gaw offered no proof, other than Employee's increase in pain, to support his opinion that

Employee's work injury caused an anatomical change, or permanent advancement, of her spondylolisthesis.

This Court has repeatedly held that an increase in pain, by itself, is not sufficient to support an award of benefits. See, e.g., Trosper, E2007-00816-SC-WCM-WC, slip op. at 8 (Tenn. Dec. 30, 2008). Accordingly, we find that the medical proof does not support a finding that Employee suffered a compensable permanent disability as a result of her June 2004 work-related injury, and therefore, Employee is not entitled to permanent total or permanent partial disability benefits.

## B. Temporary Total Disability & Medical Benefits

As previously noted, both parties agreed that Employee was temporarily totally disabled as a result of her June 2004 work-related injury. The trial court determined that she reached maximum recovery from her work injury on September 7, 2004. A majority of the Appeals Panel, however, concluded that Employee did not reach maximum recovery until November 2, 2005, approximately three months after her back surgery, and that the surgery was causally related to the work injury. On appeal, Employer argues that the evidence does not preponderate against the trial court's findings that Employee's temporary aggravation of her spondylolisthesis had resolved itself as of September 2004 when she was released by Dr. Burrus and that there was no causal relationship between the surgery and the work injury.

In order to receive temporary total disability benefits, Employee must prove (1) total disability to work by compensable injury; (2) a causal connection between the injury and the inability to work; and (3) duration of the disability. Simpson v. Satterfield, 564 S.W.2d 953, 955 (Tenn. 1978). "Temporary total disability benefits are terminated either by the ability to return to work or the attainment of maximum recovery." Id.

Dr. Burrus opined that Employee suffered only a temporary aggravation of her pre-existing spondylolisthesis. He released her to return to limited-duty work without restrictions on September 7, 2004. In a November 12, 2004 letter to Liberty Mutual, Dr. Burrus wrote "I have seen no significant anatomic change in terms of her spondylolisthesis from the time prior to her injury and her current situation. I thus feel her work-related injury exacerbated her symptoms, but I do not see that there has been any anatomic change in relation to this." Additionally, when questioned about his diagnosis of "a temporary exacerbation of her symptoms," Dr. Burrus explained that Employee's temporary exacerbations of pain prior to the work injury "generally settled down." Thus, based on her past complaints and the fact that the symptoms after the work injury were similar to those prior to the work injury, except for increased pain, Dr. Burrus opined that Employee's work injury caused only a temporary exacerbation of her congenital or acquired condition of spondylolisthesis.

Given this testimony, it was reasonable for the trial court to conclude that Employee's temporary aggravation of her pre-existing condition had resolved as of the date of Employee's last visit with Dr. Burrus, September 7, 2004. It was during this visit that Dr. Burrus recommended the same treatment options that he provided during the pre-work injury visit on May 7, 2004, and

released Employee to return to work without restrictions. Therefore, we agree with the trial court that the temporary aggravation of her pre-existing condition had resolved itself by September 2004, and as such, Employee was only entitled to temporary total disability and medical benefits from June 24, 2004, until September 7, 2004. Since Employee was actually paid benefits through December 2004, she is not entitled to any further temporary disability benefits from Employer or Liberty Mutual.[18] We therefore reverse the Appeals Panel's decision on this issue and reinstate the trial court's judgment.

Similarly, we agree with the trial court that the need for the November 2005 surgery was not causally connected to the work injury. Employee had been symptomatic since 2001. Less than two months before her work injury, Dr. Burrus discussed with Employee the need for surgical intervention after Employee had presented with increased back pain and questioned Dr. Burrus about her pain management options. The surgical intervention discussed prior to the work injury was the same surgery that was later performed and is the standard treatment for the condition. Employee's diagnosis prior to the work injury was grade I spondylolisthesis of L5 on S1 secondary to bilateral spondylolysis. The medical studies performed by Dr. Burrus after the work injury revealed the same diagnosis. At no time did any doctor testify that the grade of the spondylolisthesis changed. And, of Employee's two treating physicians, one testified that the work injury caused only a temporary aggravation while the other noted, nearly sixteen months after the injury, that he was unable to determine whether the back injury caused merely a temporary aggravation or an actual anatomical change or other advancement in the severity of the condition. Thus, given the record before us, we find that Employee's surgery was not causally related to her work injury. In light of our holding that the need for Employee's surgery was not caused by the June 2004 work injury, we hold that the claims of Intervenor must be dismissed.

Given our holding in this case, all issues regarding the extent of Employee's permanent impairment and her right to attorney fees are pretermitted. The decision of the trial court ordering Employee to pay Employer $1,300.10, representing two-thirds (2/3) of its total discretionary costs, is affirmed.

## Conclusion

For the reasons above, the judgment of the Appeals Panel is reversed and the judgment of the trial court is reinstated in all respects. Costs of this appeal are taxed to Penny Foreman for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE

---

[18]During oral argument before this Court, counsel for Liberty Mutual stated that Liberty Mutual is not seeking to recover for the overpayment of temporary benefits paid from September to December 2004 or for any medical benefits paid on Employee's behalf during this time.