# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### November 2, 2016 Session, Heard at Jackson

## JUDY KILBURN v. GRANITE STATE INSURANCE COMPANY, ET AL.

**Appeal from the Chancery Court for Williamson County**
**No. 37184    Michael Binkley, Judge**
_____

**No. M2015-01782-SC-R3-WC – Filed April 10, 2017**
_____

In this workers' compensation case, Charles Kilburn sustained several injuries from a motor vehicle accident. He underwent cervical spine surgery to resolve his neck injury complaints. His authorized physician also recommended lumbar spine surgery to combat his back pain, but that request was denied through the utilization review process. Mr. Kilburn took oxycodone to alleviate his back pain, and his treating physician referred him to a pain management clinic. Six months after the cervical spine surgery, Mr. Kilburn died due to an overdose of oxycodone combined with alcohol. After a bench trial, the chancery court found that the death was compensable. Mr. Kilburn's employer appealed. The appeal was initially referred to a Special Workers' Compensation Appeals Panel, but we later transferred the case to the Supreme Court for review. After examining the record, the parties' arguments, and the applicable law, we reverse the judgment of the chancery court.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Chancery Court Reversed.**

ROGER A. PAGE, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, SHARON G. LEE, and HOLLY KIRBY, JJ., joined.

Thomas J. Dement, II, and Jordan T. Puryear, Nashville, Tennessee, for the appellants, Ryan T. Brown and Granite State Insurance Company.

Brian Dunigan, Goodlettsville, Tennessee, for the appellee, Judy Dianne Kilburn.

## OPINION

### I. Facts and Procedural History

On November 6, 2008, Charles Kilburn, a trim carpenter, was severely injured in a motor vehicle accident during the course of his employment. His employer was Ryan Brown ("Employer"). *Kilburn v. Granite State Ins. Co.*, No. M2011-00011-WC-R3-WC, 2011 WL 10621663, at *1 (Tenn. Workers Comp. Panel Nov. 30, 2011).[1] As a result of the accident, Mr. Kilburn incurred fractures to the C3 and C4 vertebrae in his neck and disc herniations at the L4-5 and L5-S1 areas of his lower back. Dr. Jacob Schwarz, a neurosurgeon, performed an anterior cervical discectomy and surgical fusion of the C3 and C4 vertebrae on July 29, 2009, which improved Mr. Kilburn's neck pain. After physical therapy and an epidural steroid injection, Mr. Kilburn still complained of severe back pain when bending forward or backward, pain that was more severe on his left side than on the right, and lower extremity pain. Mr. Kilburn also felt heaviness in his legs after walking for a short period of time such that he would have to sit down, which Dr. Schwarz opined was a symptom of neurogenic claudication. As a result, Dr. Schwarz recommended surgery to the L4-5 and L5-S1 areas of Mr. Kilburn's lower back. However, Mr. Kilburn's insurance company denied coverage for the surgery due to a peer review by three physicians disagreeing with Dr. Schwarz's findings. The insurance company also denied Dr. Schwarz's recommendation for epidural steroid injections. Dr. Schwarz then referred Mr. Kilburn to a pain management clinic and wrote a letter to Mr. Kilburn's insurance adjustor asserting that Mr. Kilburn's pain was debilitating enough to prevent him from returning to work.

On January 4, 2010, Mr. Kilburn was evaluated by Dr. William Leone, a pain management specialist. Dr. Leone's notes reflect that he was concerned with Mr. Kilburn's consumption of alcohol while taking his medication. Mr. Kilburn also admitted that because he felt the medication was no longer effective, he was taking two opioid tablets at once even though he had only been prescribed one tablet at a time. The urinary drug screen conducted that day showed the presence of both alcohol and the opioid medication. As a result, Dr. Leone recommended weaning Mr. Kilburn off the opioid medication and trying other options. Dr. Leone prescribed 350 mg of Soma twice daily and 15 mg of oxycodone four times daily. As part of his treatment, Mr. Kilburn initialed and signed an agreement stating, "I will control my usage of narcotic medications as directed by the attending physician. <u>There are no exceptions</u>. If medication is inadequate for [my] pain level, [I] <u>must</u> call before adjusting dosage."

On January 11, 2010, Dr. Tarek Elalayli performed an independent medical evaluation of Mr. Kilburn. Dr. Elalayli gave Mr. Kilburn a four percent whole body

---

[1] This is the second appeal in this case. The first appeal concerned the trial court's denial of Ms. Kilburn's motion to amend the complaint to assert that Mr. Kilburn's death was compensable because it was related to his work injury. *Kilburn*, 2011 WL 10621663, at *1. The Special Workers' Compensation Appeals Panel to which the prior appeal was referred reversed the denial of the motion to amend and remanded the case to the lower court for further consideration. *Id.*

impairment rating for the remaining cervical spine issues and a two percent whole body impairment rating for the lower back pain. Dr. Elalayli also voiced concerns that Mr. Kilburn was magnifying his symptoms because Dr. Elalayli felt that Mr. Kilburn's subjective symptoms outweighed the objective results of his physical examination and the MRI. Dr. Elalayli recommended reducing the oxycodone dose and suggested that Mr. Kilburn return to work.[2]

During the trial, Phillip Manning, Mr. Kilburn's brother-in-law, and Judy Kilburn, Mr. Kilburn's wife, explained that prior to the 2008 motor vehicle accident, Mr. Kilburn was friendly and outgoing and was very active. However, after the injury and neck surgery, Mr. Kilburn's lower back pain seemed to Mr. Manning to be "[p]retty bad" and uncomfortable, and Mr. Kilburn was "upset" about not being able to have the lower back surgery. Mr. Manning opined that Mr. Kilburn "had anxiety about not having medication and not having the surgery" but that Mr. Kilburn never appeared hopeless, just ready to be back to full capacity. Mr. Manning stated that Mr. Kilburn started skipping doses of his medication because he was scared that he was going to run out of the medication and would be unable to obtain more.

Mr. Manning and Ms. Kilburn both explained that after the injury, Mr. Kilburn still cared for the children, got them up and ready for school in the mornings, and helped them with their homework while Ms. Kilburn was working in the evenings. Mr. Kilburn also cooked meals, performed various household duties, and ensured that the children performed their "chores," which Ms. Kilburn explained were often the tasks that Mr. Kilburn could not accomplish. In addition, Mr. Kilburn often drove to his parents' house and helped care for his mother who was ailing from cancer. Mr. Manning estimated that in the six months prior to Mr. Kilburn's death, he saw Mr. Kilburn ten to fifteen times at family gatherings, when they ate at restaurants together, and "around town."

However, Ms. Kilburn stated that after the accident, Mr. Kilburn "felt worthless because he couldn't get out and earn a living and take care of his family." Ms. Kilburn asserted that Mr. Kilburn was "still in a lot of pain," "seemed somewhat depressed," and could only achieve intermittent sleep at night. Ms. Kilburn elaborated that she believed Mr. Kilburn supplemented his medication with alcohol because it helped with his pain when he was skipping doses of his medication in an attempt to make the medicine last longer. However, Ms. Kilburn conceded that to her knowledge, Mr. Kilburn had never been without medication. Ms. Kilburn stated that before the accident, Mr. Kilburn would

---

[2] We note, and the parties indicate, that Dr. Elalayli's records show that Mr. Kilburn was receiving a 50 mg dose of oxycodone four times a day when, in fact, he was prescribed 15 mg of oxycodone four times a day. It is unclear if this was merely a clerical error or if this was the reasoning behind Dr. Elalayli's recommendation to reduce the amount of oxycodone prescribed to Mr. Kilburn.

sometimes drink during the week but drank more on the weekends when he was not working. Ms. Kilburn explained that after the accident, Mr. Kilburn did not drink as much but that "he would drink a beer here or there, a couple, maybe. He drank maybe a six pack sometimes on weekends." She also asserted that she had directed Mr. Kilburn not to drink alcohol while on his medication. While Ms. Kilburn agreed that Mr. Kilburn had never been treated for anxiety or depression, she opined that he suffered from those ailments.

Ms. Kilburn found Mr. Kilburn unresponsive in bed on the morning of January 28, 2010. The medical examiner's report specifically stated that the cause of death was acute oxycodone toxicity with contributory causes of hypertension, tobacco use, and alcohol use. His death was deemed an accident. Mr. Kilburn was forty years old at the time of his death.

At trial, Dr. Alistair Finlayson and Dr. Jeffrey Hazlewood testified by deposition about their review of Mr. Kilburn's medical records. Dr. Finlayson was a psychiatrist with a subspecialty in addictions and a clinical associate professor in psychiatry at Vanderbilt University Medical Center. He was also the medical director of the Comprehensive Assessment Program at Vanderbilt, which evaluates professionals to determine if they are "fit for duty." He performed a records review at the request of Ms. Kilburn. Dr. Finlayson stated that it was "more likely than not" that Mr. Kilburn was suffering from severe pain or anxiety at the time of his death and that it was "certainly possible" that those conditions diminished Mr. Kilburn's faculties and contributed to his risk of overdose. He further asserted that "it's probably the most likely explanation." Dr. Finlayson explained that when a person takes medications like oxycodone, they can develop a psychological dependency on the medication and that if a person develops this dependency and does not have enough medication, it can result in increased pain. Dr. Finlayson differentiated between a dependency on opiates and an addiction. He opined that Mr. Kilburn was not suffering from true addiction but rather a dependency on the medication. He also opined that in a situation like Mr. Kilburn's where there was potential for an interruption in his treatment, it was "very possible" that the situation would cause a person anxiety.

Dr. Finlayson stated that when a person is used to taking an opioid but then takes less or stops taking the medication, "the pain is intensified and anxiety is intensified as a . . . withdrawal." Dr. Finlayson stated that drugs like OxyContin, Soma, and Valium[3] all

---

[3] While we note that Dr. Finlayson discusses Mr. Kilburn's consumption of Valium several times during his testimony, in our review of the record, we find only limited information about Mr. Kilburn's taking Valium (also known as diazepam). The Fred's Pharmacy records show that on November 7, 2008, the day after Mr. Kilburn's motor vehicle accident, Dr. Schwarz prescribed Mr. Kilburn ninety tablets of Valium to be taken in thirty days. Also, in his medical records review report, Dr. Hazlewood states that

contribute to feelings of depression and hopelessness, which could potentially influence a person's judgment. He further opined that he did not believe that Mr. Kilburn was addicted to his medication but rather that "it [was] possible that . . . he was so discouraged, depressed, anxious about what was going to happen and experiencing some withdrawal symptoms that he . . . took maybe more medication than he intended to, combined with more alcohol than he intended to." However, Dr. Finlayson agreed that there was nothing in the record indicating that a treating physician had diagnosed Mr. Kilburn with anxiety. When asked what proof or evidence there was that Mr. Kilburn suffered from anxiety, Dr. Finlayson responded, "It is a guess, an educated guess from dealing with similar patients, dealing with people who receive similar prognoses and people who are withdrawing from alcohol, Valium, Soma and OxyContin. It's conjecture[,] but . . . it wouldn't be uncommon."

Dr. Hazlewood was a board-certified physician in physical medicine, rehabilitation, and pain management and had been practicing in pain management for nineteen years. He conducted a records review at the request of Employer. Dr. Hazlewood agreed with Dr. Leone's recommendation to slowly decrease Mr. Kilburn's intake of narcotics, rather than increasing the dosage, because of Mr. Kilburn's building tolerance to the medication and because of Mr. Kilburn's use of alcohol. He opined that taking 60 mg of oxycodone daily along with consuming alcohol was inadvisable. When discussing the effect of Mr. Kilburn's pain and anxiety on his judgment, Dr. Hazlewood stated that while acute pain such as breaking several bones at one time can cloud a person's judgment, he did not think that chronic pain such as Mr. Kilburn's could cloud a person's judgment. Dr. Hazlewood agreed that anxiety, depression, and suicidal ideations could cloud a person's judgment but stated that he was not qualified to state whether pain can cause an anxiety disorder. Dr. Hazlewood stated that there were warning signals that Mr. Kilburn may have been developing an addiction to opiates and that some "true addict[s]" can "lose perception" or control over the amount of medication they consume. However, he explained that an addictionologist or psychiatrist would be better able to make that determination. He further opined that there was nothing in the record to show that Mr. Kilburn suffered from anxiety or withdrawal symptoms that could cloud his judgment, especially given that Mr. Kilburn would refrain from taking his medication periodically. Dr. Hazlewood asserted that there was no objective evidence of anxiety, an inability to make sound decisions, severe or debilitating pain, or altered judgment.

---

during an emergency room visit on July 29, 2009, Mr. Kilburn reported taking Valium. However, Dr. Hazlewood also stated in his report that he did not "see any indication that [Valium] was being used at the time of death" on January 28, 2010.

Both doctors agreed that while tobacco use and hypertension were tangentially related to Mr. Kilburn's health and ability to withstand the acute oxycodone toxicity, Mr. Kilburn's use of alcohol was the primary contributing factor.

After hearing the evidence, the trial court issued its decision as a written memorandum. The trial court accredited the opinion of Dr. Finlayson over that of Dr. Hazlewood. The court found that Ms. Kilburn had sustained her burden of proof to show that Mr. Kilburn's death was a direct and natural consequence of his work injury. It awarded workers' compensation death benefits to Ms. Kilburn. Employer has timely appealed, asserting that the evidence preponderates against the trial court's finding of compensability and that Mr. Kilburn's conduct constituted an independent intervening cause of his death.

## II. Standard of Review

The standard of review of issues of fact in a workers' compensation case is de novo upon the record of the trial court accompanied by a presumption of correctness of the findings, unless the preponderance of evidence is otherwise. Tenn. Code Ann. § 50-6-225(a)(2) (2014). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual determinations made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009) (citing *Tryon v. Saturn Corp.*, 254 S.W.3d 321, 327 (Tenn. 2008)). When the issues involve expert medical testimony given by deposition, the weight and credibility must be drawn from the contents of the depositions; therefore, as a reviewing court, we may draw our own conclusions with regard to those issues. *Foreman v. Automatic Sys., Inc.*, 272 S.W.3d 560, 571 (Tenn. 2008) (citing *Orrick v. Bestway Trucking, Inc.*, 184 S.W.3d 211, 216 (Tenn. 2006)). A trial court's conclusions of law are reviewed de novo with no presumption of correctness. *Seiber v. Reeves Logging*, 284 S.W.3d 294, 298 (Tenn. 2009) (citing *Goodman v. HBD Indus., Inc.*, 208 S.W.3d 373, 376 (Tenn. 2006); *Layman v. Vanguard Contractors, Inc.*, 183 S.W.3d 310, 314 (Tenn. 2006)).

## III. Analysis

"It is well settled in Tennessee that a plaintiff in a worker's compensation suit has the burden of proving every element of the case by a preponderance of the evidence." *Elmore v. Travelers Ins. Co.*, 824 S.W.2d 541, 543 (Tenn. 1992) (citing *Talley v. Va. Ins. Reciprocal,* 775 S.W.2d 587, 591 (Tenn. 1989)). "In order to meet this burden, '[t]his Court has consistently held that causation and permanency of a work-related injury must be shown in most cases by expert medical evidence.'" *Id.* at 543-44 (quoting *Tindall v. Waring Park Ass'n,* 725 S.W.2d 935, 937 (Tenn. 1987)).

"The basic rule is that a subsequent injury, whether an aggravation of the original injury or a new and distinct injury, is compensable if it is the direct and natural result of a compensable primary injury." *Rogers v. Shaw*, 813 S.W.2d 397, 399-400 (Tenn. 1991) (citation omitted). Therefore, "'all the medical consequences and sequelae that flow from the primary injury are compensable.'" *Anderson v. Westfield Grp.*, 259 S.W.3d 690, 696 (Tenn. 2008) (quoting 1 *Larson's Workers' Compensation Law* § 10.01 (2004)). However, that rule has a limit that "hinges on whether the subsequent injury is the result of independent intervening causes, such as the employee's own conduct." *Id.* at 696. Stated another way, "'the progressive worsening or complication of a work-connected injury remains compensable *so long as the worsening is not shown to have been produced by an intervening nonindustrial cause*.'" *Id.* at 697 (quoting 1 *Larson's Workers' Compensation Law* § 10.01 (2004)). The *Anderson* court provided several examples of cases in which the injured employee's conduct constituted an independent intervening cause that rendered the subsequent injury to be non-compensable: *Simpson v. H.D. Lee Co.*, 793 S.W.2d 929, 931-32 (Tenn. 1990) (concluding that medication taken contrary to instructions constituted an intervening cause); *Guill v. Aetna Life & Cas. Co.*, 660 S.W.2d 42, 43-44 (Tenn. 1983) (determining that injecting medication contrary to medical instructions was an intervening cause); and *Jones v. Huey*, 357 S.W.2d 47, 49-50 (Tenn. 1962) (deciding that the negligent operation of a tractor after a work-related back injury was not compensable). The *Anderson* Court adopted the reasoning of *Jones v. Huey* and stated:

[W]e reject the employee's argument that only reckless or intentional misconduct can constitute an intervening cause. Instead, we find, as we did in *Jones,* that negligence is the appropriate standard for determining whether an independent intervening cause relieves an employer of liability for a subsequent injury purportedly flowing from a prior work-related injury.

*Anderson*, 259 S.W.3d at 698-99. Application of the intervening cause principle is not an affirmative defense but, rather, is a "way of assessing the scope of an employer's liability for injuries occurring after a compensable injury." *Id.* at 697; *see Shelton v. Cent. Mut. Ins. Co.*, No. E2008-00553-WC-R3-WC, 2009 WL 1110476, at *3 (Tenn. Workers Comp. Panel Apr. 24, 2009).

Applying these principles, we now address the present case. Based on the testimony at trial, it appears uncontroverted that Mr. Kilburn died from acute oxycodone toxicity with contributory causes of hypertension, tobacco use, and alcohol use and that at times, Mr. Kilburn took more of his opioid medication than prescribed and consumed alcohol while taking the pain medication. It also appears that no one contests that Mr.

- 7 -

Kilburn took his medication in contravention of his prescription and his physician's instructions. Therefore, the question at issue is whether this behavior terminated the causal link between Mr. Kilburn's work-related injury and his death.

In *Simpson*, this Court concluded that when Mr. Simpson failed to take his pain medication in accordance with the physician's instructions, which caused his demise, his death was no longer causally related to his employment. *Simpson*, 793 S.W.2d at 931-32. Similarly, in the current case, Mr. Kilburn failed to take his opioid pain medication in accordance with the instructions given to him by his treating physician.

Ms. Kilburn argues that Mr. Kilburn's death was still a direct and natural result of his work-related injury, in spite of his overconsumption of his pain medication and his drinking alcohol while taking his medication, because Mr. Kilburn had suffered from severe pain and anxiety that diminished his faculties to the extent that he was at risk to inadvertently overdose on his pain medication. In support of this contention, Ms. Kilburn cites *Shelton v. Central Mutual Insurance Co.*, E2008-00553-WC-R3-WC, 2009 WL 1110476 (Tenn. Workers Comp. Panel Apr. 24, 2009), and *Wheeler v. Glen Falls Insurance*, 513 S.W.2d 179 (Tenn. 1974).

In *Shelton*, a workers' compensation panel reversed a trial court's grant of summary judgment to the employer where the injured employee's death was caused by an accidental overdose of prescription medication because the deceased's widow produced sufficient evidence to establish, "barely," the existence of a genuine issue of material fact. *Shelton*, 2009 WL 1110476, at *6. As in the first appeal in this case, *Shelton* was decided according to the standard of review applicable to summary judgments. While at first blush these facts seem applicable to the case at hand, the current case comes to us after a full trial on the merits. Therefore, the difference in appellate review between *Shelton*, where the court had to determine if there was a genuine issue as to any material fact, and this case, where the Court must analyze if Ms. Kilburn proved that Mr. Kilburn's death was a direct and natural result of his work-related injury by a preponderance of the evidence, makes *Shelton* inapplicable to the case at bar.

Ms. Kilburn also cites *Wheeler v. Glen Falls Insurance*, 513 S.W.2d 179 (Tenn. 1974), in support of her position. In that case, an employee suffered a compensable injury to his back as a result of a fall. *Id.* at 180. Employee was an alcoholic, and after his injury, he increased his alcohol consumption, which ultimately caused his death. *Id.* The trial court awarded benefits. *Id.* Applying the material evidence standard of review in effect at that time, the Supreme Court affirmed, holding that there was material evidence to support the trial court's finding that pain from the work injury had aggravated the pre-existing alcoholism. *Id.* at 184. It is noteworthy that the standard applicable to

subsequent injuries at that time was that a claim was only considered an independent intervening cause if the subsequent injury was the result of willful or deliberate conduct. *Id.* at 183. *Anderson* specifically modified that standard to include an employee's negligence as a bar to recovery. *Anderson*, 259 S.W.3d at 698-99. Finally, we note that the Court in *Wheeler* relied heavily on the exacerbation of a prior illness, alcoholism, going so far as to compare the employee's increase in alcohol consumption to the acceleration of cancer. *Wheeler*, 513 S.W.2d at 184 (citing *Boyd v. Young*, 246 S.W.2d 10 (Tenn. 1951) (concluding that the death of an employee was compensable when the primary injury accelerated the growth of the pre-existing disease)). Mr. Kilburn in the present case did not suffer from a prior illness that was then exacerbated by his work-related injury; rather, after the accident, it appears that his drinking continued in a similar manner as prior to the accident, but he was then consuming his pain medication in addition to the alcohol. For the reasons listed above, we conclude that *Wheeler* is not controlling in the case at hand.

Finally, in support of her assertion that Mr. Kilburn's death was a direct and natural result of his work-related injury, Ms. Kilburn presented the deposition testimony of Dr. Finlayson. Because both Dr. Finlayson and Dr. Hazlewood testified by deposition, we may draw our own conclusions regarding the weight and credibility of their testimony. *See Foreman*, 272 S.W.3d at 571 (citing *Orrick*, 184 S.W.3d at 216). As set out above, Dr. Finlayson testified about the likelihood that Mr. Kilburn suffered anxiety due to his use, and the possible interruption of his use, of opioid medication that clouded his judgment. While we respect that Dr. Finlayson is a psychiatrist with a subspecialty in addictions, we also note that neither Dr. Finlayson nor Dr. Hazlewood had the opportunity to examine Mr. Kilburn. When forming their expert opinions, both doctors relied on Mr. Kilburn's medical records. Likewise, both doctors had to rely on the testimony of Mr. Manning and Ms. Kilburn, each of whom presented internally contradictory testimony concerning Mr. Kilburn's mental state. While Dr. Finlayson's specialty was more instructive on the issue of Mr. Kilburn's mental state at the time of his overdose, Dr. Finlayson's testimony was very equivocal. During his deposition Dr. Finlayson used phrases like: "it was possible," "it is a guess, an educated guess," "[i]t's conjecture[,] but . . . it wouldn't be uncommon." Dr. Finlayson also agreed that there was nothing in the record showing where a treating physician had diagnosed or even noted that Mr. Kilburn was suffering from anxiety.

Dr. Hazlewood similarly noted that there was nothing in the medical records that showed that Mr. Kilburn suffered from anxiety or withdrawal symptoms that clouded Mr. Kilburn's judgment. In fact, Dr. Hazlewood asserted that there was no objective evidence of anxiety, an inability to make sound decisions, severe or debilitating pain, or altered judgment. While Dr. Hazlewood opined that Mr. Kilburn exhibited some warning signs of an addiction to opiates and explained that some "true addict[s]" can "lose

perception" or control over the amount of medication they consume, he explained that an addictionologist or psychiatrist would be better able to make that determination. To that end, Dr. Finlayson, a psychiatrist, clarified that he did not believe that Mr. Kilburn was an addict.

Based on the above analysis, we conclude that the evidence preponderates against the trial court's findings.[4] We conclude that, like the employee in *Simpson*, Mr. Kilburn failed to take his pain medication in accordance with his physician's instructions, which ultimately caused his demise. *See Simpson*, 793 S.W.2d at 931-32. Therefore, his death was no longer causally related to his work-related injury, and his overdose was an independent intervening cause.

## CONCLUSION

In summary, we conclude that Mr. Kilburn's failure to consume his medication in accordance with his doctor's instructions was an independent intervening cause. As such, we reverse the judgment of the trial court. The costs of this appeal are taxed to the plaintiff, Judy Kilburn.

_____
ROGER A. PAGE, JUSTICE

---

[4] We emphasize the narrowness of the holding in this case. The analysis and holding are very fact specific to the case at bar. We do not conclude that an individual can never prove that an overdose is the direct and natural result of the original compensable injury when a dependency or addiction to narcotics develops. We merely conclude that based on the facts and testimony in this case, the evidence preponderates against the trial court's finding that Mr. Kilburn's death was a direct and natural consequence of his original injury.