



FILED
Oct 06, 2020
01:00 PM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Kristin Schubert | ) | Docket No. 2018-05-1213 |
| | ) | |
| v. | ) | State File No. 87914-2018 |
| | ) | |
| CuraHealth Boston, LLC, et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Robert V. Durham, Judge | ) | |

---

### Reversed and Remanded

---

The employee, a nurse manager, alleged suffering a work-related injury when she adjusted a patient's position in bed. The following day she advised her employer she was experiencing pain but stated she did not know how she had hurt herself. The employee sought medical care and was referred to a neurosurgeon after an MRI disclosed a cervical disc protrusion. Following a discussion with the neurosurgeon, the employee concluded the work incident had caused her injury. The employee timely reported her injury as being work-related, and the employer provided a panel of physicians. Following the employee's initial visit with the panel physician, the employer denied the claim based on its review of reports of the employee's earlier medical visits in which she did not mention a work-related injury. Following a trial, the court denied the employee's claim, concluding she failed to prove that her injury arose primarily out of the alleged work-related incident. The employee has appealed. We reverse the trial court's order denying the employee's claim and remand the case for the trial court to enter judgment against the employer for the benefits the parties stipulated the employee would be owed in the event her claim was determined to be compensable, and to address the employee's motion for attorneys' fees.

Judge David F. Hensley delivered the opinion of the Appeals Board in which Presiding Judge Timothy W. Conner and Judge Pele Godkin joined.

Steven C. Fifield, Hendersonville, Tennessee, for the employee-appellant, Kristin Schubert

Richard R. Clark, Jr., Nashville, Tennessee, for the employer-appellee, CuraHealth Boston, LLC

1

**Factual and Procedural Background**

Kristen Schubert ("Employee") was employed as an interim nurse manager for CuraHealth Boston, LLC ("Employer"), at the time of her alleged injury. She described her duties to include helping with orders, lab draws, and patient care. Employee contends she suffered a work-related injury on August 28, 2018, when she attempted to adjust a patient's position in bed. Employee testified she "pulled her up," and that she "kind of felt a little muscle twinge in [her] shoulder, [but] didn't think anything of it at the time, went back to work, went home that night, and woke up in excruciating severe pain."

Employee described the pain she felt when she pulled the patient up in bed as being typical pain she often experienced in her work. She stated that "after working [twelve] hours on your feet all day, you feel little aches and pain all the time." She said that when she pulled the patient up in bed, she did not have any reason to believe that she had been seriously injured. She described the remainder of her day as being "normal," stating that she went home, ate dinner, watched television, went to bed, "and woke up around 1:00 a.m. in just severe, severe pain." Employee testified the pain was in her right shoulder and neck and described the pain as "[shooting] down through my right arm into my fingers. It felt like just a major like cramp." She did not initially associate the pain she experienced during the night with repositioning the patient at work the previous day, stating "[t]he only thing I could think of was how do I make this pain stop." She took Tylenol and massaged her shoulder, stating that she "finally got it to relax a little, so [she] went back to sleep."

Employee reported to work later that day and told some co-workers about her pain but later testified, "it didn't connect still that [the pain] was anything to do with work." She told Employer's Chief Clinical Officer, her immediate supervisor, and Employer's Chief Executive Officer that she had hurt herself somehow, but "didn't know how," adding that "we didn't connect [the pain] to anything." She stated these individuals asked if she was okay, and she responded that she "was okay to work." However, she noted that her pain "didn't get any better that day and [she took] off the next day [to] go see if [she] could get a muscle relaxer or something to help ease the pain." Employee stated that her supervisors did not ask if she needed to report a work injury, and "just asked if [she] was okay, if [she] was feeling okay."

On August 30, 2018, Employee went to a chiropractor and to a walk-in medical clinic. The record of the chiropractic visit indicated that Employee had chronic right-sided neck spasm "that flared up since couple of days" and was experiencing "numbness and tingling to [right] arm and hand." The records of the walk-in medical clinic indicated the reason for Employee's visit was "[b]ack [p]ain" and included diagnoses of dorsalgia, cervicalgia, and acute pain of right shoulder. Employee was prescribed medication for pain and muscle spasms and was given a note stating she could return to light duty with a 20-pound lifting restriction through September 6, 2018. Employee testified she told both the chiropractor and the walk-in clinic provider that she had been experiencing pain for a

2

couple of days but she did not mention the work incident to either provider because she "thought it was a muscle pull, crick in the neck, just normal wear and tear of work."

Over the next week, Employee reported that she did not get any relief from the muscle relaxers, so she went to Gateway Urgent Care ("Gateway") on September 6, 2018, and was seen by Joseph Weathersby, a physician's assistant. The record of the September 6 visit indicates Employee reported right arm and shoulder pain, numbness, and right upper back pain for one week, and that she "woke up from sleep and felt like she had a cramp in her neck." Cervical and right arm X-rays were obtained, and Employee was referred for a cervical MRI. She was administered an injection of Toradol for pain and was prescribed Valium and Percocet.

An MRI was completed on September 7. Employee testified that following the MRI, Gateway called her and advised they were setting up an appointment with a neurosurgeon "to read the scans." Employee testified she did not know what the results of the MRI were at that time. She returned to Gateway on September 8 and was seen by Caleb Kent, a nurse practitioner. The September 8 report stated in the "History of Present Illness" that the MRI "demonstrated cervical disc protrusion," and that Employee "is scheduled to follow-up with neurosurgery on Tuesday. Presents today for continued pain medication. States her pain is not well controlled with current regimen." The "Assessment" included in the September 8 report stated, "[c]ervical disc prolapse with radiculopathy." A separate "Work/School Medical Excuse" document signed by the nurse practitioner stated that Employee was seen on September 6 and 8. It included "Restrictions/Limitations" of "[n]o lifting: light duty until cleared by neurosurgery for spinal disc protrusion." Employee testified she delivered this document to Employer on September 10.

Employee saw Dr. George Lien, a neurosurgeon, on September 11. According to Employee, she and Dr. Lien "discussed things that could have led up to a herniated disc and just kind of discussing and going over things that had happened since [she] started having pain." Further, she testified that "[i]t kind of dawned on [her] at that time that the only thing that led to the pain was the lifting of the patient. And [Dr. Lien] did . . . confirm that it was a pretty bad herniated disc, and that [she] would need surgery for it." Employee explained that, before meeting with Dr. Lien, she did not realize her injury was a serious injury that would require surgery. When asked what made her so sure the August 28 incident was the cause of her problems, she responded:

> Well, with just speaking to [Dr. Lien] and he asked did I do anything, and the only thing I had been doing was working. The day that I did start feeling the pain, the only thing that I did was worked that day. And so that was the only thing that we could – you know, I kind of based it off of and talked to him about it.

The following day, September 12, Employee went to Employer's facility and reported her injury as being caused by the August 28 incident. She obtained paperwork necessary to file a claim for workers' compensation benefits, which she completed at home and emailed to Employer. On September 21, 2018, Employee returned to Gateway and was seen for the second time by the physician's assistant, Joseph Weathersby, reporting "horrible pain in [her] neck." The September 21 report stated: "[work comp] when lifting [a 100-pound patient] up in the bed. Couldn't move [the] next morning. Saw Dr[.] Lien last [week] on 11th and said surgery asap but [work comp] dragging their feet."

Employer provided a panel of physicians from which Employee selected Dr. Tarek Elalayli on September 26, 2018, who she first saw on October 29, 2018. Testifying by deposition, Dr. Elalayli stated that Employee reported she "was injured at work on August 28, 2018 [when] she was pulling on a drawsheet to move a patient and felt immediate onset of right-sided neck pain." Dr. Elalayli noted a large disc herniation at C6-7 on the MRI and recommended Employee undergo an anterior cervical discectomy and fusion.

Following Employee's visit with Dr. Elalayli, and after reviewing the reports of Employee's earlier chiropractic and medical visits in which Employee did not identify a work-related accident, Employer denied Employee's claim. Employee continued treating with Dr. Elalayli and underwent surgery on January 15, 2019. She testified Employer terminated her on January 16, 2019. Dr. Elalayli kept Employee out of work from October 29, 2018 until March 20, 2019. He placed her at maximum medical improvement on May 2, 2019, and he testified that Employee retained a seven percent medical impairment to the body as a result of her injury and surgery. Employee returned to work with another employer on May 28, 2019.

Employee testified in person at trial as did her boyfriend, a licensed practical nurse who also worked for Employer at the time of Employee's alleged work injury. In the trial court's order, the court stated that the parties agreed the only disputed issue was "whether [Employee] met her burden in proving that she sustained a work-related injury to her cervical spine on August 28, 2018." The trial court denied Employee's claim, concluding that Employee did not satisfy her burden of proof. Noting that Employee was the only witness to the alleged incident, the trial court stated that Employee's credibility "is the key factor in determining whether she proved causation." The court stated that Employee "appeared nervous" during her testimony, that her voice "was often tremulous and without much volume," and that she "frequently fluttered her eyelids and often looked away as she gave her testimony." In addition, the court stated that Employee "seemed evasive when answering certain critical questions, such as those related to causation." However, the court noted that Employee "was more confident in tone, volume, and body language when giving undisputed facts." Based on the court's observations, "the Court was not persuaded by [Employee's] demeanor to find her credible as to causation." The court stated that Employee's testimony, "along with the medical records, confirmed the Court's doubt as to her account of the alleged workplace incident." Employee has appealed.

## Standard of Review

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2019). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). When the issues involve expert medical testimony in the record given by deposition, determination of the weight and credibility of the evidence necessarily must be drawn from the contents of the depositions, and we may draw our own conclusions as to those issues. *See Foreman v. Automatic Sys., Inc.*, 272 S.W.3d 560, 571 (Tenn. 2008). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2019).

## Analysis

Employee contends the trial court erred in concluding her testimony as to causation was not credible. Additionally, Employee contends that based on the lack of a medical causation opinion contrary to that of Dr. Elalayli and any "competing testimony or evidence" to Employee's testimony, the trial court erred in concluding she did not satisfy her burden of proof.

In a joint pre-compensation hearing statement, the parties stipulated to certain facts, including that "Employee's date of injury [was] August 28, 2018," and that "Employee gave verbal notice of the injury to the Employer on September 12, 2018 and written notice of the injury on September 13, 2018."[1] The statement included agreed conclusions of law, including that "Employee provided proper, statutory notice of the injury."

The trial court's denial of Employee's claim rests on its determination that Employee "failed to meet her burden of proof regarding causation." Dr. Elalayli testified that he first saw Employee on October 29, 2018, and that she gave a history of an injury

---

[1] The parties also stipulated to Employee's weekly compensation rate, the date of her maximum medical improvement, the number of weeks she was temporarily disabled, her medical impairment rating, the amount of her medical expenses, and that she had a meaningful return to work and was not eligible for permanent partial disability enhancement multipliers if her claim was determined to be compensable.

occurring on August 28, 2018, when she was "pulling on a drawsheet to move a patient and felt immediate onset of right-sided neck pain." He testified he reviewed the September 7, 2018 MRI that showed "a large, right-sided disc herniation at C6-7," which he said was consistent with the symptoms Employee reported and consistent with the mechanism of injury Employee reported. When asked about causation, Dr. Elalayli's responses included the following:

> Q: Do I have it correct in summarizing your addendum and office note that it's your opinion if [Employee] is telling the truth about her incident that your conclusion is that this is causally related to that incident, but if [Employee] is lying and instead she was injured in some other fashion and the incident with the patient didn't occur then this would not be causally related?
>
> A: Right. I mean, so when I think about causation I rely on the history that's provided to me. So assuming the history provided to me is accurate I think I can pretty safely establish causation. But if a patient wasn't being honest with me then that would call the causation into question.
>
> Q: So if [Employee] was being truthful, then, given what you've already testified to today, and what's contained in your record, is it your belief that that incident at work is more than 50 percent responsible for her herniation and the need for treatment?
>
> A: Yes.
>
> . . . .
>
> Q: Based on your personal interactions with [Employee] did you find her to be a credible patient?
>
> A: I did.
>
> . . . .
>
> Q: So . . . is it your opinion today, to a reasonable degree of medical certainty, that if [Employee] is telling the truth that she felt immediate pain while performing her work tasks on August 28th, 2018 and then woke up with severe pain radiating down her right arm, that incident contributed more than 50 percent in causing her injury and the need for the treatment that you ordered and provided?
>
> A: Yes.

Q: If [Employee] is lying about that incident and it did not occur, that would change your opinion to one of no causal relation?

A: Correct.

Dr. Elalayli clearly expressed his opinion that if the August 28, 2018 incident occurred as reported by Employee, it was more than 50% responsible for Employee's injuries and her need for treatment. He also testified he believed Employee to be credible. However, if the August 28 incident did not occur as reported by Employee, then, according to Dr. Elalayli, "that would call the causation into question."

Employee testified it was "typical" for employees to "twist our backs, pull muscles . . . [and] feel little aches and pains all the time." She testified that when she repositioned the patient on August 28, she did not have any reason to believe she had been seriously injured, and that when she awoke in pain early the next morning she did not connect the pain she was experiencing with the work incident. She stated she was in such severe pain when she awoke that she "didn't know what was going on at the moment . . . [and] remember[ed] thinking, do I need to go to the hospital." Employee testified that, later that day, she told "a couple of people at work, actually a few people," about the pain she was experiencing "but it didn't connect still that it was anything to do with work." She told her supervisors she "had hurt [herself] somehow, but didn't know how. We didn't connect [the complaints] to anything." The trial court characterized this testimony as Employee telling her supervisors "she had no idea how her injury happened." Although Employee did not initially connect her complaints to a specific incident at work, she testified she believed her symptoms, at least initially, to be nothing more than the usual aches and pains common to people in her profession. In our opinion, the trial court's characterization of Employee's testimony as telling her supervisors "she had no idea how her injury happened" fails to take into consideration the entirety of her testimony.

In addressing the initial medical care Employee sought, the trial court noted that the record of Employee's August 30, 2018 medical clinic visit "noted complaints of 'back pain,' but did not address causation." That record also included diagnoses of dorsalgia, cervicalgia, and acute pain of the right shoulder, consistent with the pain employee was reporting in her neck and shoulder. Employee testified that neither the provider in the medical clinic nor the chiropractor she visited on August 30 asked her how she was injured, and she admitted that she did not mention the work incident to them. She testified that over the next week, she did not get any relief from the muscle relaxers she was prescribed at the medical clinic, "so [she] ended up going to Gateway" where she initially saw the physician's assistant, Joseph Weathersby, and an MRI was ordered. Employee was still working at the time.

Addressing how she determined her injury resulted from the August 28 work incident, Employee testified as follows:

7

A: Dr. Lien and I discussed things that could have led up to a herniated disc and just kind of discussing and going over things that had happened since I started having pain. It kind of dawned on me at that time that the only thing that led to the pain was the lifting of the patient. And he did, you know, confirm that it was a pretty bad herniated disc, and that I would need surgery for it.

Q: Before that visit with Dr. Lien, did you realize that this was a serious injury that was going to require surgery?

A: Not at all.

Q: After the visit, when you had talked about things with the doctor, what made you so sure that the lift from August 28th was the root cause of your problems and your issues?

A: Well, with just speaking to him and he asked did I do anything, and the only thing I had been doing was working. The day that I did start feeling the pain, the only thing I did was work[] that day. And so that was the only thing that we could – you know, I kind of based it off of and talked to him about it.

Employee denied engaging in any other strenuous activities before she started having the neck and shoulder pain. She testified she did lift a patient at work on August 28, 2018, and that she felt pain right after the lift. This testimony was unrefuted.

On cross examination, Employee acknowledged that the pain she experienced when she awoke in the early morning of August 29 was "abnormal" pain and more severe than the normal aches and pains she described as regularly experiencing at work. She testified she did not mention the work incident to her boyfriend when she woke him up, stating that her pain was so severe that she was concerned with how to stop the pain rather than "what did I do." She acknowledged she did not tell Employer about the August 28 incident until September 11, stating that the pain she experienced at the time of the work incident "was normal" and she had not made the connection between the incident and her herniated disc until she spoke with Dr. Lien. She denied knowing the results of the September 7 MRI going into the appointment with Dr. Lien, and she stated that surgery was not discussed with Dr. Lien until after their discussion regarding what may have caused her herniated disc.

When asked to explain whether the pain she experienced over the two-week period from the date of the incident until she saw Dr. Lien was "just [the] normal kind of pain" she experienced in her work or whether she knew she had more serious pain, Employee stated that "[d]uring that two weeks when I woke up in severe pain, I took Tylenol,

8

massaged it, put some heat on it and the severe pain went away." She described the pain over the ensuing days as not being as severe as it was when she woke up during the night following the incident, stating on redirect examination that the pain "was still there. It was major burning, tightness. My arm actually ended up getting weaker over the next two weeks after that."

In its order denying Employee's claim, the trial court stated that Employee's history "compelled her to walk a tightrope between remembering a specific injury and explaining why she didn't tell anyone about it until after the surgery recommendation." The trial court stated Employee attempted to do so "by stating that since her symptoms abated after that initial flare-up, she did not think it necessary to try and remember a traumatic event that could have caused such an injury." The trial court concluded that the medical records did not support "this rationale." The court noted that "[b]oth [Employee] and [Employee's boyfriend] are trained nurses with substantial experience." However, neither Employee nor her boyfriend testified as expert witnesses. There is no evidence in the record establishing that either Employee or her boyfriend should have been able to diagnose Employee's symptoms or had particular, specialized knowledge that would or should have put them on notice that Employee had suffered an injury beyond what she described as the normal types of complaints one experiences in the nursing field. The court did not elaborate on how Employee and her boyfriend being nurses "with substantial experience" impacted Employee's credibility as a lay witness, other than to note that the medical records revealed Employee experienced increasing signs of radiculopathy with numbness and weakness following the August 28 incident, while Employee maintained she had no idea what the September 7 MRI revealed until she saw Dr. Lien. The trial court stated that Employee contended "it was not until [Dr. Lien] began questioning her that she finally made the connection between the lifting incident and her herniation." The trial court found this testimony "to be less than credible [and] serves to damage her credibility regarding the alleged lifting incident as well."

In addressing what the trial court characterized as Employee's "rationale," the court attributed to Employee an attempt to "walk a tightrope" between remembering a specific injury and explaining why she did not tell anyone about the incident until surgery was recommended. The court stated that, following the September 7 MRI, the physician's assistant Weathersby "scheduled an immediate follow up with a neurosurgeon [and] [w]hen [Employee] returned *a few days later*, he diagnosed a cervical disc protrusion with radiculopathy and wrote her a work excuse stating that she should not be lifting until she saw a neurosurgeon for a 'cervical disc protrusion.'" (Emphasis added.) However, Employee was not seen by the physician's assistant after her initial visit on September 6 until September 21, ten days after Employee had met with Dr. Lien and discussed what could have caused her herniated disc. Employee testified that following the MRI, Gateway called her and said they "were going to be setting up an appointment with a neurosurgeon for him to read the scans. Of course, at the time, I didn't know what the results was [sic]."

9

She returned to Gateway the following day, September 8, and was seen by a nurse practitioner, Caleb Kent, for pain, and not by Joseph Weathersby, the physician's assistant.

The record of Employee's September 8 visit with the nurse practitioner noted that she had the MRI the previous day "which demonstrated cervical disc protrusion." It stated that Employee "is scheduled to follow-up with neurosurgery on Tuesday," and that she presented that day "for continued pain and needing pain medication," adding that Employee reported "her pain is not well controlled with current regimen." The assessment in the report noted "[c]ervical disc prolapse with radiculopathy," and a separate "Work/School Medical Excuse," signed by the nurse practitioner, included restrictions of "[n]o lifting: light duty until cleared by neurosurgery for spinal disc protrusion." These records do not indicate the physician's assistant, Weathersby, was involved with Employee's September 8 visit to Gateway as indicated by the trial court. Moreover, these records do not indicate that any medical provider discussed the specific findings of Employee's MRI with her at the September 8 visit. While Employee may have assumed her MRI had positive findings based on her referral to a neurosurgeon, the records do not indicate those findings were relayed to Employee in any detailed manner. According to Employee, at her September 8 visit to Gateway she had already been referred to a neurosurgeon and was there only to follow up for her ongoing pain complaints and medications. While the record from that visit references the MRI findings, there is no indication of any discussion with or instruction by the nurse practitioner regarding those findings.

We are required by statute to presume that the trial court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7). Here, although the parties stipulated that "Employee's date of injury [was] August 28, 2018," the trial court found that Employee did not prove by a preponderance of the evidence that her cervical disc herniation arose primarily out of a work-related incident on August 28, 2018. The trial court made that finding based upon its observations of Employee's in-court testimony, stating the court "was not persuaded by [Employee's] demeanor to find her credible as to causation."

Except in the most obvious cases, the element of causation must be established by expert medical evidence. *See Hedgecloth v. Cummins Engine Co.*, No. M2014-01274-SC-R3-WC, 2015 Tenn. LEXIS 623, at *21 (Tenn. Workers' Comp. Panel Aug. 7, 2015). Although an employee's lay testimony may be relevant to the issue of causation to the extent such testimony concerns the occurrence of a work-related accident, it is expert medical proof that satisfies the element of causation, connecting the occurrence of a work-related accident to the medical condition being treated. *See* Tenn. Code Ann. § 50-6-102(14)(C), (E) (2019); *Scott v. Integrity Staffing Solutions*, No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *12 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015).

In the present case, we conclude the trial court erred in addressing whether Employee's demeanor and lay testimony were "credible as to causation." The question for determination regarding Employee's testimony was not whether Employee's testimony established causation but whether Employee satisfied her burden of proving by a preponderance of the evidence the occurrence of a work-related accident.

As previously noted, we give considerable deference to factual findings made by the trial court when the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony. *Madden*, 277 S.W.3d at 898. Here, the court characterized Employee's testimony as "often tremulous and without much volume." The transcript of the hearing does not indicate the trial judge had difficulty hearing Employee. The witnesses did wear masks when testifying due to COVID-19 restrictions as required by the trial court, but the record does not indicate that the use of masks by witnesses prevented the trial court from hearing or understanding their testimony.[2]

The trial court noted that Employee "frequently fluttered her eyelids and often looked away as she gave her testimony." We cannot discern from the record whether, at trial, witnesses faced the judge or the attorneys who questioned them, or whether the trial court was referring to Employee looking away from the lawyer questioning her or looking away from the judge. At the outset of Employee's testimony, the court asked Employee to "come up to this chair in the middle," adding that "I know that feels a little intimidating there, sitting there kind of exposed," and the court stated that Employee would need to speak up during her testimony, as she was soft-spoken. Employee stated she would try to do so, adding that it was difficult for her. The trial court did note, however, that Employee's testimony "was more confident in tone, volume, and body language when giving undisputed facts."

Our review of the record does not support a rationale, as expressed by the trial court, that Employee's "history compelled her to walk a tightrope between remembering a specific injury and explaining why she didn't tell anyone about it until after the surgery recommendation." It is significant that Employee testified that the recommendation for surgery came after her discussion with Dr. Lien about what could have caused her injury and after their conclusion that the lifting incident at work most likely caused her herniated disc. Employee's testimony was consistent as to why she did not tell Employer about the lifting incident until after her visit with Dr. Lien. Her testimony was also consistent with the history as reflected in the medical records from the providers she saw on August 30 and September 6, 7, and 8, none of which included or addressed a specific incident as being responsible for the symptoms Employee reported. Moreover, the record does not support the statement in the trial court's order in which the court concluded Employee was seen

---

[2] In her brief, Employee asserts that "on at least seven occasions, the judge asked [Employee] to speak up or repeat what she just said because he was unable to hear or understand her." Our review of the record does not indicate the trial judge's ability to hear or understand the testimony was materially affected by the masks worn by the witnesses.

after the MRI and prior to her visit with Dr. Lien by Joseph Weathersby, the physician's assistant at Gateway. Instead, the records indicate that, at the September 8 visit to Gateway, Employee was seen by a nurse practitioner.

Although the trial court concluded Employee's in-court demeanor called into question her credibility, her factual testimony as to how the work incident occurred was unrefuted. In our opinion, the preponderance of the evidence supports the conclusion that Employee suffered a work-related injury. There is no dispute that the activities Employee performed the day before she woke with intense pain were within her job duties. There is no evidence suggesting that Employee was not working on the day of her alleged injury, that she was somewhere other than with a patient at the time she alleged to have lifted the patient, or that she was not assisting a patient at the time the injury occurred. Employee provided a specific date and time range of when the incident occurred, and there is no material evidence in the record that her injury occurred in any manner other than as she testified. The medical records are consistent with the timeline of the injury as given by Employee, and the records of the providers Employee saw prior to her visit with Dr. Lien do not indicate those providers made any inquiry as to the mechanism of Employee's injury.

While Employee bears the burden of proof on all essential elements of her claim, it is significant to note that Employer offered no testimony or other evidence to contradict Employee's account of how her injury occurred. Employer argued in the trial court that the evidence addressing whether the incident occurred does not support that it occurred, that "the timeline" indicates the incident did not occur, and that "the specific nature of the mechanism of the injury . . . corroborates that this incident did not occur." Employer essentially implies that, upon being advised that she needed surgery for her cervical herniation, Employee fabricated the account of her work injury to receive workers' compensation benefits. We find no evidence in the record to support this theory, and we do not find Employer's argument persuasive. While we must give considerable deference to the trial court's credibility determinations, we conclude the preponderance of the evidence supports the conclusion that Employee sustained an injury by accident in the course and scope of her employment. Given Dr. Elalayli's uncontradicted testimony regarding medical causation, we further conclude Employee proved the essential elements of her claim and is, therefore, entitled to workers' compensation benefits in accordance with the parties' stipulations.

**Conclusion**

The preponderance of the evidence does not support the trial court's determination that Employee's cervical disc herniation did not arise primarily out of the August 28, 2018 work incident. Accordingly, we reverse the trial court's order denying Employee's claim and remand the case for the trial court to enter judgment against Employer for the benefits to which the parties stipulated Employee would be entitled in the event her claim was

determined to be compensable and to address Employee's motion for attorneys' fees. Costs on appeal are taxed to Employer.



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Kristin Schubert ) | Docket No. 2018-05-1213 |
| ) | |
| v. ) | State File No. 87914-2018 |
| ) | |
| CuraHealth Boston, LLC, et al. ) | |
| ) | |
| ) | |
| Appeal from the Court of Workers' ) | |
| Compensation Claims ) | |
| Robert V. Durham, Judge ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 6th day of October, 2020.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| Steven C. Fifield<br>Teresa Maurer | | | | X | steven@rockylawfirm.com<br>teresa@rockylawfirm.com |
| Richard R. Clark, Jr.<br>Lauren Ray Hall | | | | X | rclark@eraclides.com<br>lrayhall@eraclides.com |
| Robert V. Durham, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |

O. Yearwood

Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov