FILED
Oct 23, 2020
12:08 PM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Raphaela Hodge ) | Docket No. 2019-01-0499 |
| ) | |
| v. ) | State File No. 25060-2019 |
| ) | |
| Amazon.com, et al. ) | |
| ) | |
| ) | |
| Appeal from the Court of Workers' ) | |
| Compensation Claims ) | |
| Audrey A. Headrick, Judge ) | |

---

## Affirmed and Remanded

---

In this interlocutory appeal, the employee alleges she sustained an injury to her left shoulder while moving a box at work. The employer initially accepted the claim as compensable but later issued a denial after a statement was provided by a co-worker indicating the employee was injured at home. Following an expedited hearing, the trial court found the employee's testimony to be credible and determined she would likely prevail at trial in establishing a compensable injury. The trial court awarded medical benefits but denied the employee's request for temporary disability benefits. The employer has appealed. Having carefully reviewed the record, we affirm the trial court's decision and remand the case.

Judge Pele I. Godkin delivered the opinion of the Appeals Board in which Presiding Judge Timothy W. Conner joined. Judge David F. Hensley dissented.

W. Troy Hart and Tiffany B. Sherrill, Knoxville, Tennessee, for the employer-appellant, Amazon.com

Tim O. Henshaw, Chattanooga, Tennessee, for the employee-appellee, Raphaela Hodge

## Factual and Procedural Background

On March 13, 2019, Raphaela Hodge ("Employee") sought treatment at Erlanger Hospital's Emergency Room in Chattanooga, Tennessee, after reportedly tripping and falling over a dog kennel at home the previous night. Employee's primary complaints were knee, shoulder, and arm pain, with "increasing shoulder pain and decreased [range of motion]," but "no deformity and normal [shoulder] strength." Hospital records from that

1

visit also documented that a family member reported Employee suffered a loss of consciousness as a result of the fall. Shoulder and knee x-rays revealed no fractures or dislocations. Employee was diagnosed with left knee and shoulder contusions and was discharged with no restrictions.

Three days later, on March 16, 2019, Employee allegedly injured her left shoulder while working for Amazon.com ("Employer") when she lifted a box and felt a "pop" in her left shoulder. Employee continued to work until she realized "she could not reach up," at which time she reported to Employer's on-site medical facility, Amcare. Employer accepted the claim as compensable and provided a panel of physicians from which Employee selected Dr. Natasha Ballard.

Employee saw Dr. Ballard on April 11, 2019, and reported an onset of left shoulder pain two weeks prior to her visit. Employee provided a history of turning a box at work and feeling a "pop" in her shoulder. She did not mention her emergency room visit three days prior to the alleged work accident. Dr. Ballard performed a physical examination and obtained x-rays prior to diagnosing Employee with a sprain of the left shoulder. Employee returned to Dr. Ballard on April 19 and complained of worsening shoulder function and increased shoulder pain. Dr. Ballard placed Employee in a sling, ordered an MRI, and referred her for further evaluation with an orthopedic specialist. Employer provided a panel of orthopedic specialists, and Employee selected Dr. Benjamin Miller.

Dr. Miller evaluated Employee on June 5, 2019, and noted "left anterior shoulder pain." The doctor noted "her pain began 3/16/19 while lifting a box at work. She heard a pop . . . [and] complains of loss of motion, pain and popping." Dr. Miller reviewed a May 7 MRI performed at Chattanooga Imaging and diagnosed a torn rotator cuff. He recommended surgery to repair the torn tendon. There is no indication in Dr. Miller's record that Employee informed him of the incident occurring at home in which she tripped over the dog kennel three days before the work incident.

On July 15, 2019, Employer filed a Notice of Denial based upon "[m]isrepresentation" after Employee's co-worker, Amy Murphy, provided a written statement disputing how Employee's shoulder injury occurred. In the statement, submitted to Employer on May 9, 2019, Ms. Murphy stated that Employee spoke with her "about two weeks ago" and said "she had [fallen] at home and injured her arm but was going to Amcare to report that she hurt herself moving a box. [Employee] also stated she had already been to the [e]mergency room when she fell before coming to work." During her testimony at the expedited hearing, Employee acknowledged tripping over a dog kennel and being seen at Erlanger Hospital on March 13. However, she denied that this incident caused her shoulder injury or that she told Ms. Murphy she was going to report the incident at home as a work injury.

2

Employee returned to Dr. Miller on July 17, 2019, with complaints of worsening pain and an inability to work or lift her arm due to the pain. Dr. Miller noted that surgery "was not approved by Workers Compensation due to her having been seen 3 days prior at Erlanger for shoulder pain. She is seen today under private insurance." Employee expressed a desire to move forward with surgical repair of her left rotator cuff, and surgery was performed on July 25. Following surgery, Dr. Miller saw Employee again on September 4, noting her "[p]ain is improving." Following a recheck visit of October 16, Dr. Miller recommended continued physical therapy and noted "[Employee] will more [than] likely not be able to return to full duty [work] until 6 months post op." Employee was instructed to follow up with Dr. Miller in three months.

Employee saw Dr. Miller several times between January 2020 and April 27, 2020. At each visit, she complained of continuing pain and limitations in her ability to use her arm. X-rays performed during that time revealed no abnormality, and an MRI performed on January 15 showed the surgical repair of Employee's shoulder was intact. Dr. Miller noted Employee was compliant with his treatment recommendations and assigned work restrictions, which remained in place after her last visit with Dr. Miller via telemedicine videoconference on April 27. Dr. Miller's deposition was taken on June 22, 2020, and he testified, to a reasonable degree of medical certainty, that Employee's shoulder injury and need for surgery were caused by the work incident.

An expedited hearing was held on July 23 to consider Employee's request for additional medical treatment and temporary disability benefits. Employee, Employee's daughter, her daughter's boyfriend, and Ms. Murphy testified in person. Employee testified that after injuring her shoulder, she told Ms. Murphy, "I heard a pop in my shoulder, I am heading to Amcare. If anybody is asking for me, I am going to Amcare." During her testimony, Employee admitted that after learning her claim had been denied as a result of Ms. Murphy's statement disputing her account of the alleged injury, she called Ms. Murphy an "Amazon fly snitch" and wrote "you will be sorry later, not me" on social media. At the hearing, Employee was asked why she chose to use the word "snitch" and responded, "[Ms. Murphy] talked and she lied on me. She didn't tell the truth." Employee was also questioned about why she told Ms. Murphy she would "be sorry later," and responded, "I never said that you would be sorry for telling Amazon the truth. I said that you would be sorry for – my inclination to that was that you're going to be sorry for – you're telling a lie, but you're afraid that I tell the truth. So you're making up a lie to see if your lie was going to get me fired before I could tell the truth about you."

Ms. Murphy also testified regarding her interaction with Employee. Specifically, she testified that Employee told her about tripping over a crate at home "maybe three days prior to being back at work." Ms. Murphy testified, "[Employee] said that she had [fallen] over her daughter's dog cage [on] the floor and got hurt and hurt her shoulder, that she wasn't sure if she was going to the hospital, but when she went back to work she was going to tell them that she hurt her shoulder." Ms. Murphy stated that she did not tell Amazon

3

about the conversation until "probably a few months later." When questioned as to why she did not tell Amazon immediately, Ms. Murphy responded, "[b]ecause nothing was said about it at the time." Ms. Murphy acknowledged that she believed Employee was claiming a fraudulent injury but said nothing about it for several months. When Ms. Murphy provided Employer with her handwritten statement, she was told to "estimate the date" of her discussion with Employee regarding Employee's intent to submit a fraudulent workers' compensation claim, and she did so. Ms. Murphy later reviewed her phone records and confirmed that the conversation actually had taken place at a different time. However, she was never asked to supplement her written statement. When questioned about her exchanges with Employee on social media, Ms. Murphy testified that she "just didn't want the back and forth . . . messaging everybody I work with and calling me names and calling me a snitch and a liar."

In its expedited hearing order, the trial court determined "[Employee] testified credibly that she heard a pop when lifting a box at work on March 16. The emergency room record from her fall at home does not indicate she reported hearing a pop . . . [and] all of [Employee's] medical records following the March 16 lifting incident consistently indicate that she reported a pop at work." The court also noted that "Dr. Miller, whose opinion is presumed correct, testified that the pop she experienced when lifting a box at work caused her rotator cuff tear." In contrast, Ms. Murphy's' testimony was questioned by the court, who noted she "waited for two months after the alleged conversation with [Employee] before coming forward, and she was inconsistent as to the date the conversation occurred." Following the hearing, the trial court issued an order in which it determined Employee would likely prevail at trial in her request for medical benefits. The court issued an order for medical benefits but denied her request for temporary disability benefits because no proof of Employee's wages was submitted. Employer has appealed.

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2019). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). When the issues involve expert medical testimony in the record given by deposition, determination of the weight and credibility of the evidence necessarily must be drawn from the contents of the depositions, and we may draw our own conclusions as to those issues. *See Foreman v. Automatic Sys., Inc.*, 272 S.W.3d 560, 571 (Tenn. 2008). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of

4

correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2019).

**Analysis**

Employer contends the trial court erred in awarding additional medical treatment to Employee for an injury that is not work-related. Specifically, Employer asserts the trial court erred in two ways: (1) by relying upon the causation opinion of Dr. Miller; and (2) in finding Employee's testimony to be more credible than that of her co-worker, Ms. Murphy.

*Dr. Miller's Causation Opinion*

Employer first asserts the trial court erred by "giving weight to the opinion of Dr. Miller in making its determination on causation." In support of this assertion, Employer claims that "Dr. Miller does not know what happened and is simply going with whatever version of events [Employee] provides to him." Employer points to contradictory accounts provided by Dr. Miller regarding the details of Employee's injury at home and contends these inconsistencies are sufficient to rebut the presumption of correctness afforded to him as the authorized treating physician pursuant to Tennessee Code Annotated section 50-6-102(14)(E). Respectfully, we disagree.

In his deposition, when questioned as to whether Employee's left shoulder injury was work related, Dr. Miller responded, "I think it is work related." He acknowledged that Employee did not tell him of any preexisting conditions regarding her left shoulder and, when asked if Employee advised him of her emergency room visit on March 13, Dr. Miller responded that he was "not sure if she mentioned that. I don't have it in my notes. So I don't remember exactly if she told me that or not." Employer asked if it was "problematic" that Employee failed to mention the emergency room visit, and Dr. Miller replied, "Yeah. I think she should have told me that. It's possible that she did tell me that and I didn't document it. But I don't remember her saying that she – I don't remember that conversation." It is apparent from Dr. Miller's deposition testimony that, at some point, he became aware of Employee's March 13 emergency room visit, although it is not clear *when* he became aware of it. However, it is evident that Dr. Miller, at the time of his deposition, was aware of the emergency room visit, but that fact did not alter his opinion as to causation.

In its brief, Employer also states, "it is clear from a review of Dr. Miller's deposition transcript . . . that [he] does not know what happened," referring to Dr. Miller's differing

accounts of when Employee's at-home injury occurred.[1]  However, Dr. Miller was able to explain the reason for the disparate sequence of events contained in two separate causation letters.  The first causation letter, dated September 13, described Employee's March 16 work injury and a subsequent fall at home, "reinjuring [and] exacerbating the symptoms of the shoulder injury she sustained at work."  In this letter, Dr. Miller opined that Employee's "left shoulder injury and need for surgical intervention are greater than 51 percent related to the injury she sustained while lifting a box at work prior to her fall at home."  However, in a second causation letter of September 18, Dr. Miller amended the timeline, explaining that "some errors in injury sequence and timing were noted."  He clarified that this correspondence was sent as a "follow-up and correction regarding causation."  In attempting to correct the timeline, Dr. Miller wrote:

> Ms. Raphaela Hodge is currently under my care for her left shoulder.  Ms. Hodge suffered a fall at home on 3/12/19 for which she was seen in the emergency room on 3/13/19.  She was discharged from the hospital with the diagnosis of left shoulder contusion.  X-rays taken at the hospital showed no abnormality of the left shoulder, and physical exam only noted decreased range of motion with tenderness and pain, no loss of strength; all consistent with a fall related contusion.  She was feeling better after the fall at home and was able to return to work with no restrictions.

Dr. Miller went on to describe his initial encounter with Employee on June 5, including his review of the MRI performed on May 17.  He concluded by stating, "[i]t is my professional medical opinion that the injury sustained at work while lifting a box is likely the main contributing cause, greater than 51%, of her left shoulder injury (torn rotator cuff) and need for surgical intervention."

When asked by Employer why he corrected the first causation letter, Dr. Miller testified that "at some point we had the discussion – we had to have had the discussion on the timeline . . . I don't remember when that was because I didn't put it in my note.  So I don't know when we had that discussion.  But that's obviously the reason why we changed our – changed our letter."  It is apparent, from both Dr. Miller's testimony and the September 18 corrected causation letter, that he was aware of both the March 13 and March 16 incidents and considered both in his causation analysis.[2]

---

[1]  We also note that, to the extent Dr. Miller's deposition testimony regarding the sequence of events is unclear, we place little weight on that.  On direct examination, he is asked repeatedly about Employee's fall at home that occurred three days prior to her alleged work injury.  However, the fall is described on several occasions as being three days before Employee's first visit with Dr. Miller.  While clearly an unintentional misstatement of the timeline of Employee's injury, we cannot discern whether or to what extent this misstatement may have created any resulting confusion in Dr. Miller's testimony.

[2] In its brief, Employer notes that a "pop" may have occurred while Employee was unconscious following her fall at home.  Employer has offered no proof in support of this assertion, and the only testimony concerning a "pop" is that of Employee.  We find no merit in this contention.

Employer also challenges Dr. Miller's causation opinion based upon his acknowledgment that he relied upon the history provided by Employee in order to address causation. Employer contends Employee is not credible and, as a result, Dr. Miller's causation opinion should not be afforded any weight. However, it is undisputed that Dr. Miller is the authorized treating physician, and his opinions regarding causation "shall be presumed correct" unless rebutted by a preponderance of the evidence. Tenn. Code Ann § 50-6-102(14)(E). Dr. Miller had an opportunity to evaluate Employee and inquire into her history of injury. He found no inconsistency with Employee's medical records and her reported mechanism of injury. In fact, Dr. Miller testified that he was aware of Employee's at-home fall, reviewed her emergency room medical records, and provided a medical opinion after concluding that Employee's shoulder injury was caused by the work incident. For these reasons, we find no error in the trial court's decision to give weight to the opinion of Dr. Miller in making its determination as to causation in the context of the interlocutory hearing.

*Credibility Assessment*

Employer next contends the trial court erred in finding Employee's testimony to be more credible than that of Ms. Murphy. Employer points to "inconsistent and implausible" testimony offered by Employee during the expedited hearing, specifically, Employee's evolving definitions of the words "treatment" and "snitch" in order "to try to fit her narrative." Employer also notes that Employee denied losing consciousness after her at-home fall, contrary to what was stated in the March 13 emergency room records.

The trial court had before it two competing descriptions of events at the expedited hearing: Employee's testimony concerning the fall at home and the subsequent work injury and Ms. Murphy's testimony concerning what Employee purportedly told her. The court had an opportunity to observe and hear Employee's testimony regarding what she considers "medical treatment" as well as her reason for calling Ms. Murphy a "snitch" on social media. After listening to and observing both witnesses, the court "found [Employee's] testimony forthcoming, honest, and self-assured" and her explanation "reasonable regarding why she did not disclose her fall at home to Dr. Ballard."[3] The court found that Employee "testified credibly that she heard a pop when lifting a box at work on March 16 . . . [and] the evidence corroborates Employee's testimony."

---

[3] As noted by our colleague in his dissent, the trial court relied in part on testimony of Employee that does not appear in the record precisely as summarized by the trial court in its order. However, on direct examination, Employee did explain in more general terms why she did not report her earlier fall at home to medical providers. We conclude this testimony, albeit confusing, was a sufficient basis for the court to conclude Employee's purported failure to disclose her fall at home was reasonable. Moreover, it was not the sole basis for the trial court's credibility assessment. As a result, we conclude the totality of the proof falls short of the clear and convincing evidence necessary to establish that the trial court's credibility determinations were erroneous and does not preponderate against the trial court's determinations at this interlocutory stage of the case.

By contrast, the court questioned the reliability of Ms. Murphy's testimony, noting "she waited for two months after the alleged conversation with Employee before coming forward" and was "inconsistent as to the date the conversation occurred." In its brief, Employer asserted that the court "questioned Ms. Murphy's motivation because she did not have her timeline from the year prior straight during her testimony, [but the court] did not seem to hold Employee or Dr. Miller to the same standard as their version of events continually changed."

We acknowledge that the factual testimony from all witnesses was at times muddled, contradictory, and confusing. We further acknowledge that Employee struggled to explain her use of the term "snitch" when describing Mr. Murphy's actions and what that term meant to her. Although we may have arrived at a different conclusion regarding the witnesses' credibility, it is not the role of an appellate court to make such determinations or substitute its judgment for that of the trial court. *Cartwright v. Jackson Capital Partners, Ltd. P'ship*, 478 S.W.3d 596, 614 (Tenn. Ct. App. 2015) ("[A]ppellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.").

At an expedited hearing, an employee need not prove every element of her claim by a preponderance of the evidence but must come forward with sufficient proof from which the trial court can determine she "would likely prevail at a hearing on the merits." Tenn. Code Ann. § 50-6-239(d)(1); *see also McCord v. Advantage Human Resourcing*, No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *9 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015). Moreover, in addition to affording appropriate deference to a trial court's findings on witness credibility, we are also statutorily obligated to presume "the findings and conclusions of the workers' compensation judge are correct, unless the preponderance of the evidence is otherwise." Tenn. Code Ann. § 50-6-239(c)(7) (2019). Based on the record before us, we cannot conclude the trial court erred in its evaluation of witness credibility at this stage of the litigation.

## Conclusion

For these reasons, we conclude the evidence does not preponderate against the trial court's determination that Employee would likely prevail at trial. Accordingly, the trial court's expedited hearing order is affirmed, and the case is remanded. Costs on appeal are taxed to Employer.

8



**TENNESSEE BUREAU OF WORKERS' COMPENSATION**
**WORKERS' COMPENSATION APPEALS BOARD**

| | | |
|---|---|---|
| Raphaela Hodge | ) | Docket No.    2019-01-0499 |
| | ) | |
| v. | ) | State File No.  25060-2019 |
| | ) | |
| Amazon.com, et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Audrey A. Headrick, Judge | ) | |

David F. Hensley, J., dissenting.

In my opinion, clear and convincing evidence in this record eliminates any serious doubt that the trial court incorrectly determined the employee's testimony to be credible. For that reason, I respectfully dissent.

Tennessee Code Annotated section 50-6-239(c)(7) provides "a presumption that the findings and conclusions of the workers' compensation judge are correct, unless the preponderance of the evidence is otherwise." We have interpreted this provision of the 2013 Reform Act consistent with the standard of review employed by the Tennessee Supreme Court, which affords a presumption of correctness to a trial judge's factual findings but not to the judge's resolution of questions of law. *See McCaffery v. Cardinal Logistics*, No. 2015-08-0218, 2015 TN Wrk. Comp. App. Bd. LEXIS 50, at *7 (Tenn. Workers' Comp. App. Bd. Dec. 10, 2015).

In addition to the statutory presumption of correctness applied to a trial court's factual findings, appellate courts have also been directed to "afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility." *Kelly v. Kelly*, 445 S.W.3d 685 (Tenn. 2014). In *Kelly*, the Tennessee Supreme Court addressed the role of appellate courts in reviewing a trial court's factual findings:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are uniquely positioned to observe the demeanor and conduct of witnesses. Appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing

1

evidence to the contrary.  In order for evidence to be clear and convincing, it must eliminate any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.  Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness.

On the other hand, appellate courts are not required to give similar deference to a trial court's findings of fact based on documentary evidence such as depositions, transcripts, or video recordings.  When findings are based on documentary evidence, an appellate court's ability to assess credibility and to weigh the evidence is the same as the trial court's.  Accordingly, when factual findings are based on documentary evidence, an appellate court may draw its own conclusions with regard to the weight and credibility to be afforded that documentary evidence.

*Kelly*, 445 S.W.3d at 692-93 (internal quotation marks and citations omitted).

Deferring to a trial court's factual findings that are based on witnesses' credibility is not without limitation.  The deference reaches its limit at the point where there is clear and convincing evidence that the underlying credibility determinations are erroneous.  *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).  The Tennessee Supreme Court has described clear and convincing evidence as that in which there is no serious or substantial doubt as to the correctness of the conclusions drawn from the evidence.  *Hodges v. S. C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992).  In my opinion, the limit for deference to the trial court's credibility determination was reached and exceeded in this case.

Following the majority's review of the witnesses' credibility in this case, my colleagues state that "[a]lthough we may have arrived at a different conclusion regarding the credibility of Employee and Ms. Murphy, it is not the role of an appellate court to make such determinations or substitute its judgment for that of the trial court."  I submit it is the role of a reviewing court "to make such determinations" where, as here, the trial court's determination was clearly erroneous.  I would not characterize making such a determination as the Appeals Board substituting its judgment for that of the trial court, but as substituting a correct result for a clearly erroneous result, which is the obligation of the Appeals Board when reviewing trial courts' orders.  Here, there were irreconcilable conflicts in the employee's testimony that, in conjunction with other testimony and the documentary evidence, demonstrate that the trial court's credibility conclusion concerning the employee was clearly erroneous.

Initially, I note that in presenting the "History of Claim" in its expedited hearing order, the trial court stated that the employee tripped and fell over a dog kennel "on March 13, 2019, and sought emergency treatment for left-shoulder pain with decreased range of

2

motion." Further, the trial court stated that after her fall, the employee "resumed her normal activities, including working for Amazon," adding that, "[t]hree days later, [the employee] heard a pop in her left shoulder while lifting a box at work."

It is clear from the record that the employee's fall at home occurred on March 12, 2019, rather than on March 13 as stated by the trial court, but it is not clear when the employee next reported to work. The emergency department records disclose that the employee presented to triage at 10:45 p.m. on March 13, 2019, reporting that she "fell *last night*," that she experienced "progressive left sided shoulder, arm, and knee pain," and that "ibuprofen [was] taken *last night* [without] symptoms [sic] relief." (Emphasis added.) When asked during the expedited hearing whether she went to the hospital right after her fall at home, the employee testified she thought "maybe a couple of hours later or something like that, but not right then and there." In her affidavit entered into evidence during the hearing, the employee stated that she tripped and fell over the dog cage "[o]n March 12, 2019," and that she "reported to the emergency room the next day at Erlanger East where [she] was treated and released the same day." The employee testified that after her fall she was "doing everything the same" for herself and that she "went to work," but when asked when she first went back to work after her fall, she testified "[t]he 15th or the 16th, something like that." In her affidavit, she stated that "[b]etween March 13, 2019 and March 16, 2019, [she] was at home cleaning, cooking and doing all of [her] activities as normal, without pain or difficulties." Further, her affidavit stated that she reported to work on March 16, 2019 and was not having any trouble, "but then one or two hours into [her] shift, [she] was lifting a box and felt a pop in [her] left shoulder and had pain and reported to Amcare that day." As noted by the majority, the factual testimony from all witnesses was at times "muddled, contradictory, and confusing."

The employee's testimony concerning why, on March 16, 2019, she did not disclose to Amcare (Amazon's on-site medical clinic) that she had been treated three days earlier for the body part she alleged to have injured at work was simply not believable. However, in its expedited hearing order, the trial court did not address this testimony. The employee testified that when she reported her shoulder injury to Amcare, the paperwork she completed asked whether she was "ever treated for that body part," and that she answered "no," testifying that "because to me, my understanding of treated was, did you have to go to physical therapy at the time, did you – did the doctor give you medication." She further attempted to explain why she did not disclose the earlier shoulder treatment as follows:

> So my answer to that was no at the time because I felt like I wasn't treated. Even though I went to the emergency room, I felt like – to me, the question, I felt like it wasn't a treatment. More say it was like I saw him, and they didn't do anything about it because they said I was good.
>
> So I had miscalculated the question, but I took it as treated me, did you get medication, did you, you know, follow up at that time.

3

On cross examination, the employee again testified that she "considered treatment to be medication, physical therapy."

The March 13 emergency department records reveal that following her complaints of progressive left shoulder pain and her physical examination in which the employee "exhibit[ed] decreased range of motion" in her shoulder, the employee was prescribed Mobic and Robaxin. When presented this information on cross examination, the employee testified that she could not remember whether she was prescribed medication as a result of her emergency department visit, adding that "[m]ost[] likely it was some type of medication as far as a painkiller, and I would not have taken it." Asked whether she would "consider a pain pill treatment," she testified she "wouldn't consider a painkiller treatment because [she has] a lot of painkillers at the house." In her November 27, 2019 affidavit, the employee stated that she was at home when she tripped and fell over a dog cage, and that she "had some pain and reported to the emergency room the next day . . . where [she] was *treated* and released the same day." (Emphasis added.) Her testimony concerning whether she received treatment for her left shoulder in the emergency department cannot be reconciled. Although the trial court concluded the employee "sought emergency treatment for her left-shoulder pain," the court did not address the employee's conflicting testimony about the treatment and did not address the employee's explanation for failing to disclose her prior shoulder treatment to the provider at Amcare.

The employee's testimony attempted to minimize any inference that she sought emergency treatment for her shoulder on March 13. The employee's explanation for how her shoulder happened to be examined and treated at the March 13 emergency department visit is, again, simply not believable. Despite the fact that these records included a chief complaint of shoulder pain and arm pain, a presenting history "complaining of left shoulder and left knee pain after falling last night," and the employee's complaints of "increasing shoulder pain and decreased range of motion," when she was asked on direct examination what the purpose was for going to the emergency room, she testified she "had a problem with [her] knee." Further direct examination concerning the emergency department visit included the following:

Q: While you were there, did you complain of any left shoulder pain?

A: After I was there, I remember kind of squinching [sic] not just my neck, but I realized it – I felt like my arm kind of like a little pain, and then I busted my lip. So I actually had kind of hit my mouth and my teeth and my nose at the same time.

So I really wanted to check on my knee too because I just always felt like I was going to end up having knee problems. So that's why I went. So as I was there, I said, I told them to just check everything instead of

4

me having to use my insurance card [m]ore than once or drive from Cleveland to Erlanger more than one time.

The employee's testimony as to why she sought emergency treatment should have been considered and addressed by the trial court in assessing the employee's credibility. Instead, after noting that the employee "sought emergency medical treatment for left-shoulder pain with decreased range of motion," the trial court noted that the provider diagnosed the employee with "left shoulder and knee contusions/strains, prescribed an anti-inflammatory medication, and recommended follow-up with an orthopedist 'as needed.'"

The employee testified she had a work-related injury in 2016, and she described difficulties she experienced with her previous claim and her efforts to secure medical treatment for that injury. She testified that on March 16, 2019, she actually heard a "pop" in her shoulder when she lifted a package at work, adding that "[k]nowing that I actually heard a pop in my shoulder at work, I had no choice but to go through workmen's comp again." When she presented to Amcare on March 16, she was asked whether she preferred Amcare or an off-site facility. The employee indicated she was agreeable to Amcare treating her and testified she would "see how [her shoulder] gets, and if it gets worse, then [she would] let them know." The employee testified she "ended up taking voluntary time [off] for a good while after that," which she estimated was "a couple of weeks," stating that while she was at home her "arm was getting worse and worse." She testified that when she "finally had to go [to work] . . . [she] went straight into Amcare and told them that [she] needed to see a doctor." As a result, the employee was provided a panel of physicians and selected Dr. Natasha Ballard who she first saw on April 11, 2019. The employee made no effort to explain why she voluntarily took two weeks off work immediately after her alleged March 16 work injury. By contrast, when she was asked whether she was having any problems with her shoulder when she reported to work on March 16, she testified she "didn't have any problem[s] because, to be honest, if [she] did have problems . . . [she] could have went [sic] out on medical leave." The employee explained that she would have taken medical leave if she had "problems" after her fall, yet she offered no explanation for taking two weeks of voluntary time off after reporting her work injury to Amcare and returning to work only when she had used all of her voluntary time off work.

Finally, the employee also failed to disclose to Dr. Ballard her March 12 fall at home, the shoulder pain and reduced motion she experienced following the fall, and her March 13 emergency medical treatment. The record of the employee's initial visit with Dr. Ballard stated that the employee "[d]enies previous shoulder injury." The trial court stated in its expedited hearing order that the employee "explained that she did not disclose the fall at home since the medical provider told her she was okay, she resumed her normal activities, and returned to work." Thorough reviews of the transcript of the expedited hearing have not revealed any effort by the employee to explain why she failed to disclose her fall at home to Dr. Ballard as described in the trial court's order. In its order, the trial court stated that "[i]t found [the employee's] explanation reasonable regarding why [the

5

employee] did not disclose her fall at home to Dr. Ballard," adding that "[t]he Court finds her testimony credible." Without the employee having addressed in her testimony, or in her affidavit, her failure to disclose her fall at home to Dr. Ballard, there can be no serious or substantial doubt that the trial court erred in concluding the employee's testimony in that regard was credible, as there was no such testimony. The majority quotes and relies on this same language from the trial court's order finding the employee's "explanation reasonable regarding why [the employee] did not disclose her fall at home to Dr. Ballard." In my opinion, the majority's footnote 3 cannot reconcile the trial court's error.

While the Appeals Board has consistently expressed that a lesser evidentiary standard applies at the expedited hearing stage, *see McCord v. Advantage Human Resourcing*, No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *9 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015), a lesser evidentiary standard does not lessen the standards by which a witness's credibility is to be assessed. Here, the preponderance or the greater weight of the evidence shows the employee's testimony not to be credible. Coupled with the trial court's determination that the employee's explanation as to why she did not disclose her fall at home to Dr. Ballard was reasonable, which explanation is not included in the record, there is, in my opinion, no serious or substantial doubt that the trial court's credibility conclusion was in error. I would reverse the trial court's order and remand the case for a trial on the merits.



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Raphaela Hodge ) | Docket No. 2019-01-0499 |
| ) | |
| v. ) | State File No. 25060-2019 |
| ) | |
| Amazon.com, et al. ) | |
| ) | |
| ) | |
| Appeal from the Court of Workers' ) | |
| Compensation Claims ) | |
| Audrey A. Headrick, Judge ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 23rd day of October, 2020.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| Tim O. Henshaw<br>Missy Burks | | | | X | tim@mcmahanlawfirm.com<br>missy@mcmahanlawfirm.com |
| Tiffany B. Sherrill<br>Chrissy Almeida<br>W. Troy Hart | | | | X | tbsherrill@mijs.com<br>clalmeida@mijs.com<br>wth@mijs.com |
| Audrey A. Headrick, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |

Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov